JUSTICE FERNANDEZ-VINA
delivered the opinion of the Court.
In this appeal as of right, we consider whether the trial court’s active questioning in a first-degree murder trial constituted plain error.
A jury convicted defendant Michael Ross of committing a double murder and related offenses. The State’s theory of the ease was that defendant shot and killed the two victims because he mistook one of them for an individual who had previously threatened him *395 with a firearm. At trial, defendant testified and denied involvement in the shooting.
The State presented seventeen witnesses and defendant presented three witnesses, including himself. The trial court questioned many of the witnesses. Defendant did not object at any point during trial to the court’s questioning of witnesses. On appeal, however, defendant argued that the judge’s questioning of a number of the State’s witnesses constituted plain error.
A divided Appellate Division panel affirmed defendant’s convictions. A majority of the panel acknowledged that the trial judge’s conduct was a mistaken exercise of discretion, but concluded that the judge’s participation did not constitute plain error. Conversely, the dissenting judge maintained that the trial court’s conduct warranted reversal of defendant’s convictions.
Although some of the trial court’s inquiries were unnecessary and over-reaching, we conclude that the trial judge’s conduct did not rise to the level of plain error. Upon review of the record, we are satisfied that the trial court’s questions did not deprive defendant of a fair trial. Accordingly, we affirm the judgment of the Appellate Division and uphold defendant’s convictions.
I.
A.
Alesky Bautin and Sergey Barbashov were shot and killed on the evening of October 30, 2003. The men were sitting in Barbash-ov’s red 1999 Volkswagen Passat outside the Forest View apartment complex (“Forest View”) in Avenel when the shooting occurred. Nearly one month earlier, on October 1, defendant was stopped at a traffic signal in the Woodbridge area when a car pulled up and blocked his vehicle. A passenger defendant knew only as “Mitch” got out of the car and pointed a gun at him. In an attempt to avoid the confrontation, defendant drove away, hitting two other cars in the process. On October 2, defendant traveled to police headquarters and gave a statement regarding the incident. *396 Defendant told police that the gun-waving individual drove a burgundy or maroon Ford Taurus or Mercury Sable that he had previously seen in the neighborhood.
On October 30, defendant was with Jamil McKnight, Sherrill Williams, and Ronald Huff. The group drove to Forest View in McKnight’s car to visit a friend. McKnight did not drive because of a condition that impaired his vision. Upon seeing a red car parked outside one of the apartment buildings, defendant told the group that he spotted the individuals who had threatened him weeks earlier. Defendant said he wanted to get his gun, which he had left at McKnight’s house. Defendant also described the individuals in the car, including Mitch, as black males.
Before reaching McKnight’s house, Huff asked to get out of the car. Williams stayed at McKnight’s house while defendant and McKnight drove back to Forest View with the gun. As they passed Barbashov’s car, defendant fired multiple shots into the car from approximately three to four feet away. McKnight claimed he and defendant discarded the gun before visiting a mutual friend, Greg Wakefield. McKnight admitted retrieving the gun before dawn on October 31, and that he and Williams gave the gun to a man in Queens whom he knew only as Dante.
Huff, who was walking around the neighborhood at the time of the shooting, heard multiple shots. Walking in the direction of the shooting, Huff approached Barbashov’s car and saw Bautin, who appeared to be dead, and Barbashov, who was still alive. Huff heard sirens and told Barbashov that help was on the way. Officer Christopher Lyons of the Woodbridge Police Department responded to the shooting. When he arrived at the scene, he found Bautin dead with a bullet hole at the base of his skull behind his ear lobe. Lyons found Barbashov alive in the driver’s seat and called for an ambulance. Responders transported Barbashov to the hospital for emergency surgery, but doctors there were unable to save him.
Several spent shell casings and bullets were found in and around Barbashov’s vehicle. Gary Mayer, a forensics ballistics *397 investigator, determined that the spent shells, bullets, and fragments recovered from the scene had all been fired from the same nine-millimeter firearm. Mayer examined a nine-millimeter Glock handgun belonging to Barbashov’s business partner and concluded that the rounds at the scene were not fired from that gun.
With no further leads, the investigation stalled. Eventually, the police received information leading to Sharhi Roberts, defendant’s ex-girlfriend. Roberts was arrested on municipal court charges and agreed to give a statement to police in exchange for dropping the charges against her. Roberts told police that defendant had admitted to her on two separate occasions that he committed the murders.
Wakefield, who was also facing charges in an unrelated case, reluctantly gave a statement to the police in which he said that defendant had admitted to committing the murders. Wakefield did not have an attorney present when he gave his first statement to the police, and averred at trial that authorities pressured him to implicate defendant. Sergeant Mark Clements, who investigated the crime on behalf of the Middlesex County Prosecutor’s Office, stated that Wakefield was with authorities for approximately seven and one-half hours on the date he gave his first statement and took a polygraph exam.
In September 2006, nearly three years after the October 30 shooting, police arrested defendant. McKnight was arrested in New York for disposing of the firearm that had been used in the shootings, and defendant was arrested three days later for the murders. Police never recovered the murder weapon.
B.
In October 2006, a Middlesex County grand jury issued an indictment charging defendant with two counts of first-degree murder, contrary to N.J.S.A. 2C:11—3(a)(1) and (a)(2); second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a); third-degree unlawful possession of a *398 weapon, contrary to N.J.S.A. 2C:39-5(b); and third-degree hindering apprehension, contrary to N.J.S.A. 2C:29-3(b)(3).
An eight-day jury trial was held in 2008. On April 1, the State called the first of its seventeen witnesses. Officer Vincent Totka, who investigated the October 1 gun-waving incident, was the first witness to testify. The trial judge asked Officer Totka, who took defendant’s statement the day after the incident, a brief series of questions to establish defendant’s age at the time of questioning and to clarify why defendant’s father was not in the room when the officer took defendant’s statement regarding the gun-waving episode. Totka responded that defendant was twenty-one years old at the time and that parental consent was not needed.
Detective Michael Ng, who investigated the motor vehicle accident resulting from defendant’s driving away from Mitch, was the second witness to testify. The trial court posed several questions to Ng, whose responses established that the police asked defendant’s father to have defendant contact them about the accident and that defendant came to the station the following day. Following Ng’s testimony, a Verizon employee and a New Jersey State Police lieutenant testified regarding the 911 call made on the night of the murders. The trial court asked those two witnesses limited questions. Bautin’s brother and Barbashov’s girlfriend were the next witnesses to testify, and the court posed only a few questions.
On the second day of trial, the State called Huff, who had been in the car with defendant, McKnight, and Williams on the evening of the murders. Huff described what he witnessed that night and testified as to what he told the police in response to their questioning during the investigation. During his direct testimony, Huff referred to defendant and McKnight by their nicknames and denied knowledge of their real names. During cross-examination, defendant responded to questions using defendant and McKnight’s real names. After cross-examination, the court had Huff clarify that he knew their real names only at the time of trial and not previously:
[Court]: So, in other words, you know who the real name of Sagacious is now?
*399 [Huff]: I do not, no.
[Court]: Now?
[Huff]: Now.
[Court]: That is what I’m saying.
[Huff]: Jamil, whatever his name is.
[Court]: Do you know his last name now?
[Huff]: If they say it again I’ll know.
[Court]: Did the attorney just ask you about McKnight?
[Huff]: Jamil McKnight. Yes.
[Court]: Jamil McKnight?
[Huff]: Jamil McKnight. Like I said, I don’t know his real name.
[Court]: But you think that’s his real name now?
[Huff]: Yes.
The judge also asked Huff some questions regarding the details of the night of the murders, including the weather conditions and the lighting.
Next, the State called Roberts, defendant’s former girlfriend who previously informed police that defendant had confessed to her. In her testimony, Roberts stated for the first time that defendant told her that he “made up” his story about committing the shootings. Roberts also testified that the police pressured her into implicating defendant, and the court directed her to answer defense counsel, who had asked her to recount specific instances of harassment:
[Defense Counsel]: Can you describe for the jury the manner in which they harassed you with as much specificity as you can.
[Roberts]: Okay. They came to my house. I’ve been evicted from places.
[Court]: I’m sorry. Came to your house and what?
[Roberts]: They came to my house. Harassed me numerous times.
[Court]: In other words, the question is we need specifics. What did they do?
Specifically, what did they do? What did they say? What did they do?
[Roberts]: Well—
[Court]: Okay.
[Roberts]: They—
[Court]: They came to your house. What else?
At that point, Roberts gave a more detailed answer. Shortly thereafter, defense counsel asked Roberts a question that prompted an objection from the State and a sidebar discussion. After *400 concluding the discussion at sidebar and before defense counsel resumed cross-examination, the following colloquy took place:
[Court]: All right. Now, Miss Roberts, you have to listen to the questions of [defense counsel] very carefully. All right?
[Roberts]: Okay.
[Court]: You listen to the question and you think and you only answer his question.
[Roberts]: Okay.
[Court]: Try to focus on his question and then try to give a specific answer to that question. Right? Could you do that?
[Roberts]: Yes.
[Court]: I appreciate it. Thank you very much. Yes, [defense counsel].
[Defense Counsel]: All right. Sharhi, describe how you were harassed. I don’t just mean the cops showed up. How many times did they come, what did they say to you and so forth, things like that.
[Roberts]: They came numerous times.
[Court]: Came where, ma’am?
[Roberts]: To my house, to my job. They waited in the parking lot of my job. They came into my job, gave false statements about me.
[Defense Counsel]: What statements did they make about you?
[Prosecutor]: Judge, that’s hearsay. It’s hearsay.
[Court]: Overruled.
The defense then attempted to draw out Roberts’s assertions about police harassing her into making a statement, and Roberts answered defense counsel’s question regarding the timing of the alleged harassment:
[Defense Counsel]: Okay. So when’s the first time that you can remember the police coming to you and harassing you?
[Roberts]: The first time I remember was my father’s house.
[Court]: When? When? When? When? Not where.
[Roberts]: I can’t remember the exact day.
[Court]: Well, was it like—was it before ,.. October 30, 2003, or was it after October 30?
[Roberts]: It was after.
[Court]: Was it a month after, a year after?
[Roberts]: A year, a year—almost two years—it was a little after November, I want to say—I want to say '05—
[Court]: Okay.
[Roberts]: —6, November.
[Court]: November 2005.
*401 The court also guided Roberts when answering defense counsel’s questions regarding her police interview, whether she had an unrecorded pre-interview, and whether she had an attorney present. During defense counsel’s cross-examination and recross-examination of Roberts, the court frequently overruled the State’s objections.
The next witness to testify was Officer Lyons, who responded to the scene of the shooting. The trial court posed several questions regarding Lyons’s efforts to secure the crime scene, the lighting conditions, and other details about the scene. The court also asked several clarifying questions:
[Defense Counsel]: Do you ever recall telling a witness they were going to be a witness or they were going to get a green sheet? Do you recall any of this?
[Court]: Hold on. Do you recall any of that, sir?
[Lyons]: I believe you're asking the same question again, sir.
[Defense Counsel]: No, I’m not.
[Court]: Specific words.
[Lyons]: Okay. I don’t recall.
Following Lyons’s testimony, John Haley, a retired officer from the Middlesex County Prosecutor’s Officer who responded to the scene of the shootings, testified regarding the evidence gathered from the scene. After cross-examination, the court engaged in a colloquy with Haley about how the crime scene was processed.
The State later called Roberts’s attorney, who rebutted Roberts’s assertion that he had advised her not to tell police that defendant recanted his confession to her. The trial court did not ask any questions during direct or cross-examination. The State then called McKnight to describe what happened the night of the double homicide. The court’s intervention was limited—the judge asked McKnight to repeat or clarify a few points to ensure that the court’s notes were accurate.
The State called Mayer, from the Somerset County Prosecutor’s Office, to testify whether the firearm from Barbashov’s business partner matched the shell casings recovered from the scene. During direct examination, the court asked Mayer to clarify his *402 testimony that two guns made by the same manufacturer would have different markings in the barrel and to explain what Mayer meant when he referred to “lands” and “grooves.” The court also elicited the location of the evidence vault of the forensic ballistic unit. In addition, the court asked Mayer to clarify the term “proved positive” and how the forensic ballistics unit labels evidence. The court also clarified a few questions asked by the prosecutor, including whether Mayer had the ability to compare lead fragments in the case microscopically, not whether he actually did; and whether Mayer could list, “for the record,” the major gun manufacturers capable of firing the projectiles found in this case.
After a brief cross-examination, the court engaged in a colloquy with Mayer. The court asked about the differences between a revolver, a semi-automatic weapon, and an automatic weapon. The judge also asked about how many weapons were used and which casings matched. In addition, he asked Mayer about the significance of the term “Luger” and what happens to a projectile when it is fired from a weapon. The prosecutor asked additional questions after the court’s colloquy with Mayer, but defense counsel declined the opportunity to further cross-examine Mayer.
Wakefield, who was with defendant the evening of October 30 before the murders, also testified. Wakefield stated that authorities pressured him to implicate defendant. The court’s questioning of Wakefield was limited. Sergeant Clements of the Middlesex County Prosecutor’s Office testified on behalf of the State regarding his role in the investigation of the double homicide. Clements rebutted Wakefield’s testimony that he had been pressured to give a statement to the police. Defense counsel cross-examined Clements on how much time Wakefield had been in custody before providing a formal statement, and how much time Wakefield spent with the polygraph examiner before providing the statement. The judge interrupted and, at sidebar, told counsel that Clements, who was not present during the polygraph, could not possibly know about the procedures employed by the examiner that night.
*403 During redirect, the prosecutor established that Clements did not know how long a polygraph examiner would spend explaining the test or administering preliminary questions before beginning the actual examination. In a recross examination, of Clements, defense counsel established that Wakefield was in police custody for an extended period of time suggesting that Wakefield’s disclosure was the result of aggressive interrogation from the police. After redirect and recross, the court asked if the polygraph examination was administered in a separate room and established that Clements and Lyons were not present during the administration of the test. Both the prosecutor and defense counsel asked follow-up questions after the court’s inquiries.
The State also posed questions to the medical examiners who performed the autopsies on Barbashov and Bautin. After defense counsel declined to cross-examine both witnesses, the court engaged in questioning of Dr. Frederick DiCarlo, who performed the autopsy on Bautin, and Dr. Andrew Falzon, who performed the autopsy on Barbashov. After defense counsel declined to cross-examine Dr. Falzon, the following colloquy took place:
[Court]: All right. So, the cause of death is gunshot wounds, right?
[Dr. Falzon]: Correct.
[Court]: Which—what’s the mechanism of death?
[Falzon]: The mechanism would be shock.
[Court]: You have to tell the jury.
[Falzon]: The mechanism of death would be shock. Basically when a person sustains gunshot wounds in a case like this, they are bleeding internally. And they go into what we term as hemorrhagic shock where there is not enough blood left in the vascular system to sustain life.
[Court]: All right. You’re saying shock is equated with loss of blood?
[Falzon]: Correct.
[Court]: And what—how do you classify this?
[Falzon]: The manner of death?
[Court]: Yeah, manner of death.
At this point, the prosecutor asked for a sidebar, during which the parties agreed that the manner of death was the province of the jury and should not be elicited by the judge. The court then asked one question regarding the time of death, and gave both parties *404 the chance to ask follow-up questions. Both the prosecutor and defense counsel declined.
After the State rested, the defense called three witnesses: a private investigator hired by defense counsel; defendant’s friend, Chaney McPhatter; and defendant himself. The defense called Chaney McPhatter as an alibi witness, and she testified that she thought she remembered seeing defendant at her house on the night of the murders. On cross-examination, the State highlighted that McPhatter was only thirteen years old at the time of the murders and confronted her with a statement in which she told investigators that she did not recall defendant visiting that night at all.
In his testimony, defendant described the October 1 gun-waving incident. He denied that Mitch was involved and stated that the gun-waving assailant exited a Taurus or Sable. Defendant acknowledged knowing that Mitch drove a 1988 red Volkswagen Jetta. Defendant testified that on the night of the murders, he was driving with McKnight, Williams, and Huff when they saw a Taurus leaving Forest View. McKnight suddenly asked to return home. When they arrived there, Huff left and McKnight entered his house, returning to the car with something wrapped in a bandana. Defendant believed it was a gun. Defendant drove to the house of a friend, Latoya McPhatter, Chaney McPhatter’s older sister. Leaving McKnight and Williams in the car, defendant briefly stayed at Latoya McPhatter’s house. Defendant then walked to Wakefield’s house, where McKnight arrived later. Defendant denied shooting the victims.
During cross-examination, it was revealed that authorities recorded a telephone conversation defendant had with his father while incarcerated in 2006 without defendant’s knowledge. Defendant told his father he was not in Middlesex County at all on the night of the murders. He also told his father that Mitch was, in fact, involved in the October 1, 2003 incident.
The trial court did not engage in independent questioning of defendant, Chaney McPhatter, or the private investigator.
*405 During the final jury charge, the judge instructed the jury that it should not be influenced by his questioning:
[T]he fact that I may have asked questions of a witness or different witnesses in the case must not influence you in any way in your deliberations. The fact that I asked questions does not indicate that I hold any opinion one way or the other as to the testimony given by the witness.
In its fifth day of deliberations, the jury indicated it was unable to reach a verdict, and the court delivered a Czachor charge.[1] A juror became ill, and, after dismissing that juror the following day, the judge substituted an alternate juror and instructed the jury to begin deliberations anew.
The jury deliberated over the course of four additional days before convicting defendant of the first-degree murders of Bautin and Barbashov, second-degree possession of a weapon for an unlawful purpose, third-degree unlawful possession of a weapon, and third-degree hindering apprehension.
Defendant moved for a new trial before sentencing, but defense counsel did not challenge the trial court’s questioning. After denying defendant’s motion for a new trial, the court sentenced defendant to two consecutive life terms on the murder counts, each subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a consecutive five-year term on the hindering charge.
The Appellate Division subsequently reversed defendant’s convictions, holding that the trial court erred in substituting a juror after the jury announced it was deadlocked. We reversed and remanded for the Appellate Division to consider defendant’s other points on appeal. State v. Ross, 218 N.J. 130, 93 A.3d 739 (2014).
On remand, an Appellate Division panel rejected defendant’s remaining contentions in a split decision. The majority and dissent disagreed as to whether the trial court’s questioning constituted plain error. Defendant filed a notice of appeal as of right by virtue of the dissent in the Appellate Division. N.J. Const. art. VI, § V, ¶ 1(b).
*406 Because the parties are limited to the issues raised by the dissent, R. 2:2-l(a)(2), the sole issue in this appeal is whether the trial court’s questioning rose to the level of plain error. The Court granted the Attorney General amicus curiae status.
II.
Defendant argues that the trial court’s excessive involvement warrants reversal as plain error. He posits that “this case presents a distortion, if not a breakdown, of the carefully circumscribed roles of the participants in a trial that define our adversary system.” Defendant emphasizes that a trial judge may only intervene to expedite the proceedings, clarify testimony, or assist a witness or counsel in distress. Defendant avers that the trial court’s inquiries did not fit within these limited purposes.
Recognizing that he did not object at trial, defendant claims the lack of objection below is not an impediment to reversal. Citing State v. Taffaro, 195 N.J. 442, 950 A.2d 860 (2008) and State v. O'Brien, 200 N.J. 520, 984 A.2d 879 (2009), defendant notes that this Court has previously granted reversal as a matter of plain error where a trial court questioned witnesses. In addition, defendant highlights the “awkwardness” of objecting to a trial court’s intervention at trial and asserts that the impact of the court’s questioning may not have seemed prejudicial until viewed cumulatively.
Defendant points out several instances in which the trial court’s questioning of witnesses was improper. Specifically, defendant references the court’s inquiries of Officers Totka and Ng, Huff, Roberts, Wakefield, Mayer, and the medical examiners. Defendant maintains that the trial court’s extensive questioning of those witnesses mandates reversal of his convictions.
The State notes that defendant did not object to the court’s questioning at trial. The State contends that defendant’s failure to object at trial demonstrates that he did not view the court’s intervention to be prejudicial. The State submits that the court’s questions were primarily clarifying in nature and that the court *407 posed few questions to the witnesses most pivotal to the State’s case. The State also distinguishes Tajfaro and O’Brien on the basis that the court did not make any inquiries of defendant or his alibi witness. The Attorney General agrees with the State that the trial court’s intervention did not give rise to plain error.
III.
A.
When a defendant fails to object to an error or raise an issue before the trial court, we review for plain error. R. 2:10-2. We may reverse on the basis of unchallenged error only if the error was “clearly capable of producing an unjust result.” Ibid. “The possibility of an unjust result must be ‘sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.’ ” State v. Williams, 168 N.J. 323, 336, 774 A.2d 457 (2001) (quoting State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971)). A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court’s actions constituted plain error. State v. Weston, 222 N.J. 277, 295, 118 A.3d 331 (2015). A defendant assumes this burden because “to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.” Id. at 294-95, 118 A.3d 331 (quoting Macon, supra, 57 N.J. at 333, 273 A.2d 1).
Defendant suggests that his failure to object at trial is excusable because of the “awkwardness” of objecting to the trial court’s conduct in front of the jury. Defendant, however, need not have objected to the trial court’s questioning in front of the jury and could have done so at sidebar. In fact, during the trial court’s questioning of Dr. Falzon, the State requested a sidebar and challenged the propriety of the court’s inquiry to the medical examiner about Barbashov’s manner of death. After this exchange at sidebar, the court asked only one question regarding the time of *408 death. That the State raised an issue as to the trial court’s questioning at sidebar, which had the effect of curtailing further intervention from the court, convinces us that defendant’s capacity to object at trial was not as precarious as he and our dissenting colleague attempt to portray.
Defendant also contends that his failure to object at trial was justifiable because the impact of the court’s questioning may not have seemed prejudicial until viewed cumulatively. In light of defendant’s failure to object to the nature or scope of the trial court’s questioning in his motion for a new trial, we are unpersuaded by this contention. Because defendant failed to object to the trial court’s questioning, we analyze his claim in this appeal through the lens of plain error review.
B.
The New Jersey Rules of Evidence explicitly permit trial judges to interrogate witnesses. Judges are authorized to question witnesses “in accordance with law and subject to the right of a party to make timely objection.” N.J.R.E. 614. Indeed, we have recognized that the discretionary power of a judge to participate in the development of proof is of “high value.” State v. Guido, 40 N.J. 191, 207, 191 A.2d 45 (1963). A trial judge may intervene to expedite the proceedings and clarify testimony. O’Brien, supra, 200 N.J. at 534, 984 A.2d 879. A trial judge may also pose questions to help elicit facts from a witness who is in severe distress. Taffaro, supra, 195 N.J. at 451, 950 A.2d 860.
Although a trial judge has wide latitude to question witnesses, a judge must exercise this authority with “great restraint,” especially during a jury trial. Ibid. A judge must use considerable care when questioning witnesses to avoid influencing the jury. Ibid. There is a grave risk that a trial court may influence a jury through its questioning by signaling doubt about a witness’s credibility or suggesting that it favors one side over the other. See O’Brien, supra, 200 N.J. at 523, 984 A.2d 879 (noting *409 that judge “holds powerful symbolic position vis-a-vis jurors ... and must refrain from any action that would suggest that he favors one side over the other, or has a view regarding the credibility of a party or a witness”). A fine line separates proper and improper judicial questioning. A trial court crosses this line when its inquiries give the jury an impression that it takes one party’s side or that it believes one version of an event and not another. See Taffaro, supra, 195 N.J. at 451, 950 A.2d 860 (citing Village of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132, 145 A.2d 306 (1958)).
In determining whether a trial judge crossed over this line, we must examine the record as a whole. See id. at 454, 950 A.2d 860. “[I]t is the impact of the court’s questions, and not the number of minutes they lasted, which matters most.” Ibid. With these legal principles in mind, we assess whether defendant has met his burden of establishing that the trial court’s actions constituted plain error.
IV.
A.
Defendant challenges the trial court’s queries to the first two witnesses to testify on behalf of the State, Officers Totka and Ng. We find the court’s eliciting defendant’s age at the time of his interview with police regarding the gun-waving incident and the reason defendant’s father was not in the room to be nothing more than an innocuous intervention. Although it was not necessary for the trial court to draw out this information, the court’s intervention did not indicate to the jury that it held a favorable view of Officer Totka or that it favored the State’s case. In addition, the purpose of Officer Totka’s testimony was to describe the gun-waving incident as a basis for defendant’s motive for the October 30 shooting. The trial court’s questions were clearly tangential to the crux of Officer Totka’s testimony as they did not convey to the jury information about defendant’s motive.
*410 As to Officer Ng, defendant claims the trial court’s inquiries had the effect of highlighting defendant’s failure to report the gun-waving incident immediately or voluntarily. Like Officer Totka, Officer Ng testified for the limited purpose of establishing defendant’s motive for the October 30 shooting. The court’s questions were peripheral to this underlying purpose and did not strike at the heart of Officer Ng’s testimony. In short, although the trial court’s intervention after both officers were cross-examined was unnecessary, it was not damaging to defendant.
Because the judge asked limited questions of the Verizon employee and of the state trooper, defendant does not focus on these witnesses, and next challenges the court’s intervention during Huffs testimony. We fail to discern how the trial court prejudiced defendant by clarifying that Huff learned the real name of Jamil McKnight only at the time of trial. Defendant also highlights the court’s questioning of Huff about the lighting conditions and avers that this effectively supported the State’s theory that he sought to exact revenge on Mitch, but mistakenly shot two innocent individuals. However, this questioning could also have buttressed defendant’s theory of the case that it was McKnight, a man with poor eyesight, who mistakenly shot the victims. Thus, whether the court’s questioning of Huff had an adverse effect on defendant’s case is speculative at best.[2] Because we may reverse on the basis of unchallenged error only if the *411 error was “clearly capable of producing an unjust result,” R. 2:10-2, the court’s questioning of Huff does not mandate reversal.
B.
Turning to defendant’s claim that the trial judge’s “harshest intervention was reserved for Sharhi Roberts,” it is difficult to assess from the record the harshness of this intervention. Nonetheless, the judge’s questioning of Roberts was proper as it fell squarely within the well-recognized judicial role of clarifying testimony.
Significantly, the trial judge’s exchange with Roberts, who was a State witness, took place while defense counsel was cross-examining her. The court guided Roberts to answer defense counsel, who had asked Roberts to describe with “as much specificity” as possible how Officers Clements and Lyons had harassed her. When Roberts simply replied, “[t]hey came to my house. I’ve been evicted from places,” the court intervened and told her that counsel’s question called for specifics. Roberts only provided a detailed answer to defense counsel’s question after the court guided her to answer the question with the specific information that counsel was asking her to provide.
In addition, before defense counsel resumed his cross-examination of Roberts, the trial court instructed Roberts that she had “to listen to the questions of [defense counsel] very carefully” and she had to “think” and “answer his question.” Contrary to defendant’s contentions, the court was not acting as an advocate for the State, and any “harshness” toward Roberts stemmed from the State’s witness not being responsive to defense counsel’s questioning. If anything, the court’s admonitions to the witness had the effect of facilitating defense counsel’s cross-examination of a non-responsive witness testifying on behalf of the State.
Defendant also maintains that the court’s impatience with Roberts signaled doubt about her claims of harassment. The record does not support this interpretation. In fact, the court repeatedly overruled the State’s objection to defendant’s line of inquiry in an *412 attempt to permit its full development. Because the trial court’s intervention with Roberts was unlikely to affect the result when viewed in the context of her testimony as a whole, we do not find that intervention to rise to the level of plain error. That defendant himself characterizes the trial court’s treatment of Roberts as its “harshest intervention” foretells the difficulty defendant encounters in showing plain error as to the court’s questioning of the other witnesses.
C.
The trial court also extensively questioned the State’s forensic ballistics expert and the two medical examiners who performed the autopsies on the victims. Although the trial court heavily intervened during this testimony, it’s questions were harmless. Indeed, the court’s questioning was largely gratuitous and, as the Appellate Division correctly recognized, “the questions ... seemingly served only to display the judge’s personal knowledge of the subject matters involved.” Accordingly, although the court acted imprudently when questioning these witnesses, the effect of the questioning was neither prejudicial to defendant nor supportive of the State. Because “it is the impact of the court’s questions, and not the number of minutes they lasted, which matters most,” defendant’s emphasis on the amount of questions the court posed to these witnesses is unavailing. Taffaro, supra, 195 N.J. at 451, 950 A.2d 860.[3]
D.
Finally, defendant relies on Taffaro and O’Brien, in which the trial judge’s conduct constituted plain error. Taffaro and O’Brien, however, are readily distinguishable from the case at bar. In *413 Taffaro, supra, the trial judge extensively questioned the defendant in a manner that “underscored the weaknesses in his defense.” Id. at 448, 452, 950 A.2d 860. As we explained, “the questions had the effect of suggesting to the jury that the [trial] court doubted defendant’s account in a case that rested heavily on defendant’s credibility.” Id. at 453, 950 A.2d 860.
Likewise, in O’Brien, supra, the trial judge engaged in lengthy questioning of the defendant and key defense witnesses. 200 N.J. at 526-33, 984 A.2d 879. The defendant in O’Brien confessed to fatally shooting his parents, and his sole defense at trial was diminished capacity. Id. at 524-25, 984 A.2d 879. In advancing his diminished capacity defense, the defendant presented a psychiatrist as an expert witness. Id. at 525, 984 A.2d 879. We concluded that the questions the trial judge posed to defendant’s medical expert were “damaging to the overall fairness of the trial” because they “[e]xpress[ed] clear disbelief in the witness’s conclusions.” Id. at 538, 984 A.2d 879. As to the trial court’s questioning of the defendant, we determined that “the only inference [the jury] could draw from the judicial intervention was that [the] defendant’s testimony probably was not true.” Id. at 537-38, 984 A.2d 879. Moreover, the trial court questioned one of the State’s investigators in such a way that it “effectively hammered nails into defense counsel’s ongoing cross-examination and bolstered the State’s witness.” Id. at 539, 984 A.2d 879. Encountering a trial judge “who appeared to disbelieve [the defendant] and his expert witness, revealed that disbelief to the jury, and supported a witness adverse to [the defendant],” this Court had little difficulty in finding plain error. Id. at 539-40, 984 A.2d 879.
In contrast to Taffaro and O’Brien, the trial court in this case did not question defendant or his alibi witnesses. Rather, the trial judge interjected only during the testimony of some of the State’s seventeen witnesses. And even then, the court posed few questions to the four witnesses whose testimony mattered most in resolving the primary contested issue in this case—the identity of the shooter. The trial judge asked only a few questions of Huff, *414 McKnight, and Wakefield, who were with defendant on the night of the murders.
Although the judge was at times harsh with Roberts, defense counsel was fully able to impeach her credibility regarding defendant’s alleged incriminating admissions. Unlike the trial judge in O’Brien, supra, who “effectively hammered nails” into defense counsel’s cross-examination of a State witness, the trial judge here accorded defense counsel flexibility in cross-examining Roberts, as demonstrated by his repeated rejection of the prosecutor’s objections. Moreover, the judge actually helped facilitate defense counsel’s cross-examination of Roberts. Defendant’s comparison with Tajfaro and O’Brien as support for his position falls short because those cases are plainly distinguishable.
Furthermore, it is unlikely that the trial court’s putative error “led the jury to a result it otherwise might not have reached.” Williams, supra, 168 N.J. at 336, 774 A.2d 457 (quoting Macon, supra, 57 N.J. at 336, 273 A.2d 1). Notably, defendant’s credibility was severely impaired on cross-examination. After testifying that he was at Latoya McPhatter’s house when the shootings occurred, the State confronted defendant with his jailhouse call to his father in which he stated he was not in Middlesex County on the night of the murders.
The trial court’s jury instructions also indicate that the court’s intervention did not lead the jury to a result it otherwise might not have reached. The last witness called by the State, and the last witness to whom the judge posed any questions, testified on April 10, 2008. The last witness, defendant, testified on April 15. Before the jury began its deliberations on April 16, the trial judge carefully instructed the jury that the questions he posed to witnesses should not influence them. After extensive deliberations, the jury announced its verdict on April 29, nearly three weeks after the court asked its last question. In an egregious case of judicial intervention, a jury instruction may be insufficient to offset the prejudicial effect of improper questioning by the court. See Taffaro, supra, 195 N.J. at 448, 454, 950 A.2d 860. On this *415 record, where the court did not cast doubt on the credibility of defendant or underscore weaknesses in his defense, we can fairly conclude that the jury followed the judge’s instructions. See State v. Loftin, 146 N.J. 295, 390, 680 A.2d 677 (1996) (“That the jury will follow the instructions given is presumed.”).
Averring that this was a very close case, the dissent suggests that the jury’s deliberation over five days illustrates that the judge placed his thumb on the scale. Courts are not able to draw accurate inferences from the length of deliberations. The only observation we can make from the deliberations is that the jury spent five days weighing the evidence. Thus, the dissent’s reliance on the jury’s deliberations to show that the trial court placed its thumb on the scale is unavailing.
V.
By intervening during defendant’s trial, the trial judge in this case skirted perilously close to the fine line that distinguishes proper and improper judicial conduct. The court, however, did not cross that line. We emphasize that judges must remain ever vigilant not to cross that line by asking questions that suggest a favorable impression of a party or signal doubt about a witness’s credibility, or overly intervene in counsel’s questioning.
Here, it bears repeating that defendant did not object at trial to the court’s questioning and our review is confined to the plain error standard. We view counsel’s failure to object as an indication that counsel perceived no prejudice in the court’s questioning. After a careful review of the record, we cannot discern any prejudice that would warrant reversal of defendant’s convictions.
VI.
Accordingly, we affirm the judgment of the Appellate Division and uphold defendant’s convictions.
*416 CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON join in JUSTICE FERNANDEZ-VINA’s opinion. JUSTICE TIMPONE filed a separate, dissenting opinion.

 State v. Czachor, 82 N.J. 392, 413 A.2d 593 (1980).

 The dissent asserts that the court's questioning of Huff is of "particular concern" because the judge acted as a second prosecutor “to elicit testimony to dispel the theory posed by defense counsel that the poor-visioned McKnight was the shooter who mistook the red Passat for a maroon Mercury.” Post at 427, 163 A.3d at 301. Specifically, the dissent highlights the judge's remark, [o]f course there were lights on,” after Huff mentioned it was dark. The dissent concludes that this exchange favored the State. The court's remark favors neither since both the defense’s and prosecution’s theories were that the shooting occurred based on an inability to make observations. Additionally, the dissent raises the argument that the judge in so stating testified on the State’s behalf in questioning Huff despite defendant's never having advanced that argument.

 The dissent similarly makes much of the fact that the trial court asked a multitude of questions to numerous witnesses. In doing so, the dissent erroneously gives short shrift to Taffaro's instruction that we must determine the prejudicial impact of the court's questioning in the context of the trial as a whole.