# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2435-16T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

R.D.,

      Defendant-Appellant.

_____

      Submitted January 27, 2020 – Decided February 27, 2020

      Before Judges Sumners, Geiger and Natali.

      On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 14-10-1560.

      Joseph E. Krakora, Public Defender, attorney for appellant (Joshua David Sanders and Lauren Stephanie Michaels, Assistant Deputy Public Defenders, of counsel and on the briefs).

      Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

A jury convicted defendant R.D. of second-degree sexual assault of David,[1] his non-biological grandson, contrary to N.J.S.A. 2C:14-2(b), and second-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4(a). He was sentenced to a seven-year term of imprisonment for the sexual assault conviction subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act. See N.J.S.A. 2C:43-7.2. The court also sentenced defendant to a concurrent seven-year term for the endangering the welfare of a child conviction. In addition, the judgment of conviction imposed a restraining order pursuant to Nicole's Law, N.J.S.A. 2C:14-12, ordered that defendant comply with Megan's Law, N.J.S.A. 2C-7-1 to -225, and required that he serve parole supervision for life, N.J.S.A. 2C:43-6.4.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> TESTIMONY ABOUT CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME [(CSAAS)] WAS NOT BASED ON RELIABLE SCIENCE AND WAS UNDULY PREJUDICIAL. ITS ADMISSION NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.

---

[1] Pursuant to Rule 1:38-3(c)(9), we use pseudonyms to protect the privacy of the child and members of the family.

A-2435-16T2

POINT II

THE SENTENCE IS MANIFESTLY EXCESSIVE BECAUSE, AFTER EXPIRATION OF HIS PRISON TERM, DEFENDANT WILL BE CLOSELY MONITORED FOR THE REST OF HIS LIFE AND WILL BE A LOW RISK TO REOFFEND.

A. The Sentencing Court Improperly Found Aggravating Factor Three.

B. The Sentencing Court's Analysis Of Deterrence Was Fundamentally Flawed.

1. Based upon both the fact that defendant's offense was intrafamilial and his age upon release, he is less likely to reoffend in the future.

2. Because defendant will be strictly monitored upon his eventual release, he is less likely to reoffend in the future.

Defendant filed a supplemental letter brief, presenting the following point:

POINT I

STATE V. J.L.G.[2] APPLIES RETROACTIVELY TO THIS CASE, AND THE IMPROPER ADMISSION OF EXPERT TESTIMONY ON [CSAAS] REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

A. J.L.G. Announced A New Rule Of Law: Expert Testimony About CSAAS Is Inadmissible. That New Rule Should Be Accorded Complete Retroactivity, Or At The

---

[2] 234 N.J. 265 (2018).

A-2435-16T2

Very Least, Pipeline Retroactivity. When That New Rule Is Applied To This Case, It Necessitates Reversal Of Defendant's Convictions.

B. The improper admission of CSAAS expert testimony in this case was harmful error.[3]

Having considered these arguments in light of the record and applicable legal standards, we reverse and remand for a new trial. Because we are reversing defendant's convictions based on the improper admission of CSAAS evidence, we need not address defendant's sentencing arguments raised in Point II.

I.

David lived in Mahwah between September 2013 and May 2014 with his biological grandmother, Rachel, his mother, Vicky, and his aunt, Veronica. Defendant stayed in the residence occasionally, but did not permanently reside in the home.

Patrolman Rosario Zito of the Mahwah Police Department testified at trial that he was dispatched to David's home on May 14, 2014 in response to an allegation that David was sexually assaulted. After speaking with Vicky, Zito

---

[3] We have renumbered defendant's argument for consistency and clarity.

went upstairs alone to speak to David who "seemed very timid and shy." Zito attempted to ask David some questions regarding the allegations, but David did not immediately respond. He then brought David downstairs where Vicky proceeded to ask David questions. After listening to the conversation between Vicky and David, Zito informed his sergeant, who subsequently arrived at the home with Patrolman Eric Larsen and Detective Kevin Hebert.

Detective Kelly Krenn of the Bergen County Prosecutor's Office (BCPO) Special Victims Unit also testified at trial. Krenn stated that Hebert informed the BCPO about the allegations and that he instructed Hebert to transport Vicky and David to the BCPO office so David could be interviewed forensically in the office's child-friendly interview room. David, Vicky, and Veronica arrived at the BCPO office later that day. Detective Jenn Rueda, who was also assigned to the Special Victims Unit, conducted the forensic interview with David while Krenn, Hebert, Larsen, and Sergeant Cecilia Love watched from a screen in the conference room.

David also testified and first answered in the negative when the prosecutor asked whether "anybody ever touched [him] in a place that they shouldn't touch." David also answered yes then no as to whether he remembered telling a detective about someone touching his body parts. He also denied ever telling anyone that

defendant touched his private parts. When the prosecutor asked whether "grandpapa ever touch[ed] your penis" and whether he "ever touch[ed] your butt," David answered no both times.

Krenn then testified that after David's trial testimony, he met with David and his guardian Donna to take them back to their residence in New York. While speaking to David, he handed Krenn a handwritten note which stated, "I want to live in New Jersey" and "Mr. Kelly, can I live in New Jersey?" After Krenn inquired what the note was regarding, David allegedly told him he "lied to [Krenn] before, but now that [he] told the truth, can [he] now live in New Jersey?"

David was recalled to testify and authenticated the note that he provided to Krenn. David answered affirmatively when the prosecutor asked him whether he told Krenn he "lied before and that [he was] telling the truth today, so can [he] live in New Jersey?" When David was asked why he left New Jersey, he responded that it was "[b]ecause [he] said grandpapa touched [him]."

When David was asked on direct examination whether his statement that defendant never touched him was a lie or the truth, he answered that it was the truth. David further indicated that he wanted to go back to living in New Jersey with "[his] aunt, [his] mother, [his] grandma, and grandpapa," and reiterated that

he loved defendant and wanted to live with him. On cross-examination, David again denied that defendant ever touched his private parts and reemphasized that telling Kelly that defendant touched him "was the lie."[4]

During Rueda's trial testimony, the State played the video recording of her initial forensic interview with David. During that interview, David told Rueda that defendant touched him in the area of his groin, and that "[i]t's fun" and made him feel "happy." After Rueda attempted to confirm that defendant touched him in the groin, David stated, however, that "[defendant] didn't touch [him]" and that defendant was merely "touching [his] hair." David later told Rueda that on one occasion, while he was wearing his Iron Man pajamas, defendant touched him "with his hair," which David acted out, according to Rueda, by "putting [a doll's] whole face and head into the groin area of the male doll." David also told Rueda that defendant touched his "button" with his hair. Rueda testified that David denied being touched by defendant's mouth or hands.

---

[4] On direct examination, it was initially unclear what statements David was referring to as the "lie" because he stated that "grandpapa never touching [him]" was "the entire lie." On cross-examination, however, when asked whether "grandpapa ever touched [his] private parts," David answered no. When he was further asked if he "remember[ed] telling Detective Kelly that grandpa touched [him]" and whether that was "a lie or was . . . the truth," David answered "[y]es" and "[t]hat was the lie."

After Rueda's testimony, Anthony Vincent D'Urso, Psy.D., testified regarding CSAAS. During opening arguments, the prosecutor described Dr. D'Urso as "an expert in [CSAAS]" and informed the jury that he was "going to explain that sometimes children that have been sexually abused . . . tell the little pieces, they don't tell all the details at once . . . and sometimes they tell them and then take it back." The prosecutor further stated that Dr. D'Urso was "going to explain why [children] may do that and why that is normal."

As part of his qualifications, Dr. D'Urso introduced himself as a "supervising psychologist" and "section chief" of a "legislatively mandated child abuse center" that "tend[s] to see most of the sexual abuse cases, some severe physical abuse cases, and . . . cases of severe psychological maltreatment." He stated that he testified as an expert "over 250 times on just CSAAS" and emphasized that such testimony was "allowed in [forty-nine] of the [fifty] states."

After the court admitted Dr. D'Urso as an expert in CSAAS without objection, he stated that CSAAS "[was] not a diagnostic tool," and his explanation of the syndrome was "just to provide typical characteristics of kids who act in a particular manner relative to child sexual abuse" because "some of the things that may be true in child abuse are counterintuitive [and] not logical."

He also explained that CSAAS was "not a tool that goes to the proof of something . . . [but that] it is simply trying to explain why kids may not act in the way we think they should act when something aversive like sexual touch occurs." Dr. D'Urso, then proceeded to elaborate on the CSAAS theory of the five behavioral phases child abuse victims pass through as a result of abuse: secrecy, helplessness, entrapment/coercion/accommodation, delayed or unconvincing disclosure, and retraction or recantation.

Dr. D'Urso specifically testified that "there's not one credible study in the world that says kids typically [disclose abuse] after the first sexual incident, and by definition if they don't typically tell, then you're going to have delayed disclosure." He further elaborated on unconvincing and piecemeal disclosure stating that "kids are very unlikely to tell you everything that happened over this period of time either because of emotional trauma, memory . . . [or] too many events to remember everything." He noted that "while it's all about the same act of abuse, [children] might give different parts of that abuse to different people based upon the role the child thinks they have in their life . . . [but that] it's not more things coming out as much as a difference of when they're either ready to tell or to whom they're telling." Dr. D'Urso concluded that "[t]here's no data to suggest that there's any predictable time period, so six months, a year, two

months, two years, there's no data which would tell us that the length of time tells us anything about the veracity of the disclosure."

With respect to retraction or recantation, Dr. D'Urso stated that it happens "when [children] begin to understand that there are impacts of the things they say . . . [and if] they don't receive support from the system around them, then the child is likely to pull back on those . . . statements." When asked if it was uncommon for a child to give a disclosure and then take it back very quickly, he confirmed that "it is a dynamic that happens in child abuse." He further provided that children "may say things like I made it up [or] it didn't happen" and that he typically saw such behaviors in "familia[l] cases [where] it would generally be [a] disruption of the family, breaking apart of the family, or a function of the relationship that exists between the child and the perpetrator." He concluded that "if kids have to make a decision between tolerating the abuse themselves . . . or los[ing] an apartment . . . los[ing] a caregiver, [or] los[ing] support, they'll tend to internalize the abuse."

The court provided the standard jury charge on CSAAS prior to Dr. D'Urso's cross-examination, as well as a similar charge before jury deliberations that substantively tracked Model Jury Charges (Criminal), "Child Sexual Abuse Accommodation Syndrome" (rev. May 16, 2011), stating in relevant part:

I just want to, again, tell you that you can only consider Dr. D'Urso's testimony for limited purposes . . . . But you may not consider Dr. D'Urso's testimony as offering proof that child sex abuse occurred in this case. The [CSAAS] is not a diagnostic device and cannot determine whether or not abuse occurred. It relates only to a pattern of behavior of the victim which may be present in some child sex abuse cases. You may not consider expert testimony about the syndrome as proving whether abuse occurred or did not occur.

Similarly, you may not consider the testimony as proving in and of itself that [David], the alleged victim here, was or was not truthful. Dr. D'Urso's testimony may be considered as explaining certain behavior of the alleged victim of child sex abuse. As I just stated, that testimony may not be considered as proof that the abuse did occur or did not occur.

The accommodation syndrome, if proven, may help explain why a sexually abused child may have delayed reporting or recanted abuse or denied that the sex abuse occurred, or any other such characteristics as testified.

On cross-examination, Dr. D'Urso confirmed that he did not speak to anyone regarding the facts of this case and that "the information that [he] gave is of a general nature regarding [CSAAS]." Defendant did not object to the CSAAS testimony.

Finally, the State recalled Krenn who testified that on April 6, 2016 he picked up David and Donna for a second forensic interview at the BCPO from their residence in New York. The recorded interview was also played for the

jury. David, who was now six years old, initially denied that anyone ever touched his private parts or "any places that [he didn't] like to be touched." David, however, eventually told Krenn that on one occasion, defendant touched "[his] private" with his hands in his bedroom while laughing. More specifically, David stated that on the day the police were called, defendant put his hand on his private and "shaked it." Contrary to his earlier statement that he was wearing Iron Man pajamas, David indicated that he was wearing jeans, a shirt, and sneakers at the time of the incident. He stated that he told defendant to "[s]top . . . [b]ut he [kept] doing it" and that he told "Grandma [Rachel]" sometime after.

The State did not introduce any other witnesses to substantiate the allegations against defendant.[5] In addition to David's recorded statements, the State introduced into evidence a diagram it used to help David identify parts of the body, the note that David handed to Krenn asking to live in New Jersey, and a photograph of defendant.

Defendant testified and stated that David was not his biological grandson and that he and David's grandmother were separated at the time. On direct and re-direct examination, defendant denied touching David in a sexual way.

---

[5] David's mother, Vicky, was subpoenaed to testify on behalf of defendant but after a N.J.R.E. 104 hearing, the defense did not call Vicky as a witness.

A-2435-16T2

Defendant first denied staying at the house or ever spending time with David in the home during the time that he lived in Mahwah, but he later admitted that he occasionally stopped by to bring groceries. Defendant also admitted that he slept with his wife, David's grandmother, in the home but denied staying there overnight and stated that it occurred only when the kids were not present.

During closing arguments, the prosecutor reminded the jury that Dr. D'Urso "talked about how children often meld details into one" and that he "educate[d] everybody about the syndrome and how children disclose and why children do the things that they do." The prosecutor further noted that he "talked about the scientific research that absolutely children give a disclosure and they take it back, and that's normal, it doesn't mean it didn't happen." The prosecutor emphasized that based on Dr. D'Urso's testimony, "if there's a disruption in the family . . . [or] [i]f the child's disclosure isn't supported[,] there could be a recantation," and argued that "those factors apply in this case."

As noted, after considering the evidence, the jury convicted defendant of sexual assault and endangering the welfare of a child. This appeal followed.

## II.

"If a defendant, as here, does not object or otherwise preserve an issue for appeal at the trial court level, we review the issue for plain error . . . [and] must

disregard any unchallenged errors or omissions unless they are 'clearly capable of producing an unjust result.'" State v. Santamaria, 236 N.J. 390, 404 (2019) (quoting R. 2:10-2). The Supreme Court has explained that "[p]lain error is a high bar." Ibid. If a defendant raises an issue for the first time on appeal, the defendant "'bears the burden of establishing that the trial court's actions constituted plain error' because 'to rerun a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" Id. at 404-05 (quoting State v. Ross, 229 N.J. 389, 407 (2017)). "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Williams, 168 N.J. 323, 336 (2001))

Defendant principally argues that there is "a narrow window of appropriate expert testimony in child sexual abuse cases [and that the CSAAS] testimony in this case exceeded those bounds." Defendant further maintains that Dr. D'Urso's testimony cannot be dismissed as harmless error because "the jury was exposed to the fullest extent of this unreliable evidence and was encouraged to use that evidence to find that abuse occurred." Defendant concludes that since there was "no physical evidence, no eyewitnesses, and certainly no confession,"

this was a case that hinged on credibility and "admission of the CSAAS expert testimony 'could have appreciably tipped the credibility scale.'" We agree.

During the pendency of this appeal, our Supreme Court issued its opinion in J.L.G. The Court partially overturned its holding in State v. J.Q., 130 N.J. 554 (1993), and held that:

> [b]ased on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory — delayed disclosure — because scientists generally accept that a significant percentage of children delay reporting sexual abuse.
>
> We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. In particular, the State must show that the evidence is beyond the understanding of the average juror.
>
> [J.L.G., 234 N.J. at 272 (citing N.J.R.E. 702).]

The J.L.G. court noted that admissibility of CSAAS expert testimony on this limited aspect of the syndrome "will turn on the facts of each case." 234 N.J. at 272. When a victim gives "straightforward reasons about why [he or] she delayed reporting abuse, the jury [does] not need help from an expert to evaluate [his or] her explanation. However, if a child cannot offer a rational

15

explanation, expert testimony may help the jury understand the witness's behavior."  Ibid.

J.L.G. permits expert testimony about delayed disclosure or causes for delayed disclosure; however, "[t]he testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion."  234 N.J. at 303.  For example, we found it improper for a CSAAS expert to testify that the five CSAAS categories of behavior "may be behaviors exhibited by a truthful child sex abuse victim." State v. G.E.P., 458 N.J. Super. 436, 450-51 (App. Div. 2019).  Admissibility of CSAAS expert testimony, nevertheless, may be harmless "in light of the overwhelming evidence of [a] defendant's guilt."  J.L.G., 234 N.J. at 306.

The J.L.G. court did not opine with respect to whether its holding applied retroactively.  We recently concluded in G.E.P., however, that the holding "should be given at least pipeline retroactivity," rendering it applicable to all cases in which the parties have not exhausted all avenues of direct review when the Court issued its opinion in J.L.G., 458 N.J. Super. at 448.  We fully endorse the G.E.P. court's pipeline retroactivity holding and its reasoning.

Turning to defendant's arguments, we initially note that this was not a case that turned on David's failure to report abuse prior to May 2014.[6] Even if David delayed reporting any earlier abuse, Dr. D'Urso's testimony strayed beyond the limits of "explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion." See J.L.G., 234 N.J. at 303.

We acknowledge that the court's limiting instructions, along with Dr. D'Urso's testimony that he did not know anything about the facts and circumstances of the case, potentially mitigated the negative impact the CSAAS testimony may have had on the jury. Specifically, as noted, the trial judge issued limiting instructions both after Dr. D'Urso's direct testimony and in the final charge instructing the jury that it "may not consider Dr. D'Urso's testimony as offering proof that child sex abuse occurred in this case" and "may not consider

---

[6] In this regard, the State argues on appeal that introduction of CSAAS testimony was harmless as Dr. D'Urso "never claimed that CSAAS testimony could be used to assess defendant's guilt or innocence," the prosecutor "never intimated to the contrary," and his testimony "was not a critical factor in the jury's determination of defendant's guilt." The State does not argue that the CSAAS testimony was appropriate to explain why David did not report the abuse immediately after any incidents that may have occurred prior to May 2014.

17

expert testimony about the syndrome as proving whether abuse occurred or did not occur."

And, Dr. D'Urso also stated that he was merely going to "provide a backdrop of the differences between abuse and why some of the factors may be present that, again, seem illogical or don't seem to make sense so that you can know that it is typical in child abuse for certain things to occur." He further stated:

> [CSAAS should not be] used in any quantitative or diagnostic manner. You can't say if three [categories] are present that's more meaningful than two or less meaningful than four. It is not a tool that goes to the proof of something, it is simply trying to explain why kids may not act in the way we think they should act when something aversive like sexual touch occurs.

We are not convinced, however, under the unique facts of the case where the evidence was not overwhelming and the victim recanted his initial claims, that the jury instructions and Dr. D'Urso's disclaimers were sufficient to ensure the fact-finding process was not substantially impaired as the CSAAS testimony went well beyond the scope of what is allowable under J.L.G.

Indeed, as in G.E.P., Dr. D'Urso's CSAAS testimony included explanations of all five categories of behavior including secrecy, helplessness, entrapment, and retraction or recantation, in addition to delayed disclosure.

Further, the "admission of CSAAS testimony [in this case] presented the real possibility of an unjust result . . . [because] credibility was the lynchpin of the State's case." G.E.P., 458 N.J. Super at 454. Here, David's credibility was a central issue for the jury to resolve and required an assessment of David's recanted trial testimony and the two recorded interviews. Dr. D'Urso's testimony, and particularly the portion related to recantation, improperly gave the jury an "expert opinion" that informed on this central issue.

We disagree with the State's argument that "[t]he fact that the jury asked to review the victim's testimony, the forensic interviews[,] and defendant's testimony but [never] asked to hear Dr. D'Urso's testimony demonstrates beyond any doubt that the jury recognized that [his] testimony was for educational purposes only." Rather than serving as a mere "educational" tool, the State relied significantly on Dr. D'Urso, who it qualified as an expert, and his CSAAS testimony to help explain why David's recollection of the alleged incidents was inconsistent with his forensic interviews, as well as why he would renounce his previous allegations of sexual abuse at trial on two discrete occasions. In these circumstances, we conclude the CSAAS testimony "improperly bolstered [David's] testimony, raising a reasonable doubt as to the validity of the verdict." G.E.P., 458 N.J. Super at 457.

Further, the State relied heavily on Dr. D'Urso's testimony during its closing argument when it stated that "children give a disclosure and they take it back, and that's normal, it doesn't mean it didn't happen." The prosecutor further emphasized that based on Dr. D'Urso's testimony, "if there's a disruption in the family . . . [or] [i]f the child's disclosure isn't supported there could be a recantation," and argued that "those factors apply in this case."

In addition, although Dr. D'Urso stated that he was unaware of the factual details surrounding David, his testimony touched upon distinctive facts of the case. For example, after David disclosed the abuse, there was a "disruption of the family, breaking apart of the family, or a function of the relationship that exists between the child and the perpetrator." And according to Dr. D'Urso, abuse victims have to "make a decision between tolerating the abuse [himself] . . . or los[ing] an apartment . . . los[ing] a caregiver, [or] los[ing] support." Here, the jury was informed by David's testimony that he now lived in an apartment in New York with a new guardian, his mother, and his aunt, but he expressed his desire to move back to New Jersey to live with his aunt, mother, grandmother, and grandfather again. Thus, Dr. D'Urso's testimony regarding the "general nature" of CSAAS provided the jury with precise explanations why David's inconsistent disclosures and subsequent recantations occurred.

Finally, contrary to the finding of harmless error in J.L.G. due to the "overwhelming evidence of [a] defendant's guilt," 234 N.J. at 306, no such overwhelming evidence existed here. In J.L.G., the victim testified about a series of escalating acts of sexual abuse, she recorded an encounter during which defendant sexually abused her, the recording corroborated her testimony, explicit and disturbing language on the recording confirmed the victim's description of abuse, law enforcement monitored phone conversations between the victim and defendant in which he offered her money and other items in exchange for retracting her accusations, and the victim's mother testified that she found defendant lying on top of the victim while erect. Ibid.

Here, defendant denied his guilt at trial and the State provided no witnesses that observed the abuse, and no evidence other than a body part diagram, David's note to Krenn, a photograph of defendant, and David's interviews, which were inconsistent. David also recanted the allegations of abuse on two distinct occasions during his testimony. Thus, the CSAAS testimony here likely "severely impaired the defense's ability to test the victim's credibility" which was "clearly capable of producing an unjust result," see G.E.P., 458 N.J. Super. at 465 (citing R. 2:10-2), and was "sufficient to raise a

21

reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

### III.

In light of our decision, we need not address defendant's arguments that his sentence was manifestly excessive because he will be closely monitored upon release and is a low risk to reoffend, or that the sentencing court improperly found aggravating factors three and nine.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION