RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2883-17T2

STATE OF NEW JERSEY IN
THE INTEREST OF T.M., Jr.,
a Juvenile.

_____

Submitted October 31, 2019 – Decided August 11, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FJ-03-0373-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Janet Anne Allegro, Designated Counsel, on the briefs).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Jennifer Bentzel Paszkiewicz, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

T.M., Jr. (T.M.), a juvenile, appeals from the February 13, 2018 adjudication of delinquency for five offenses that would constitute criminal acts

if committed as an adult and the sentence imposed for those offenses. We affirm.

## I.

Burlington County officials charged T.M. with the following offenses arising from the October 23, 2016 home-invasion robbery and shooting of a young man in Willingboro: first-degree robbery, N.J.S.A. 2C:15-1(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:15-1(a)(1); and second-degree burglary, N.J.S.A. 2C:18-2(a)(1).

At trial, the State presented evidence of the following version of events: T.M., his brother, and T.M.'s girlfriend, A.P.K., conspired to rob the victim at the victim's home. A.P.K., who had previously dated the victim, accepted an invitation to his home for a party. When she and the victim were alone in his bedroom, A.P.K. sent T.M., through a third party, a description of the layout of the home and location of the room in which the victim could be found.

While A.P.K. and the victim were in bed, T.M. and his brother, who was armed with a handgun, broke into the house, entered the bedroom, and attempted

A-2883-17T2

to restrain the victim. During the struggle, T.M.'s brother shot the victim in the head.

T.M., his brother, and A.P.K. left the home with various items belonging to the victim, including two video game consoles. The victim survived the shooting and identified T.M., his brother, and A.P.K., all of whom he had known for many years from attending the same school, as the assailants. In an interview with police shortly after the shooting, A.P.K. identified T.M. and his brother as having participated in the armed robbery.

Before trial, the State moved pursuant to N.J.R.E. 901 and 902 to authenticate records from Facebook, a social media platform. The records related to a Facebook account that T.M. admitted was his, but which he claimed had been hacked prior to the shooting and was controlled by an unknown person. The records include inculpatory messages connecting the account holder to the crimes and the sale of the victim's stolen property. In addition, the records show photographs of T.M., his family and friends, and messages that identify T.M. as the person in control of the account, all posted after the shooting.

In an oral opinion, the trial court found the State had authenticated the Facebook records:

> In this case . . . the State subpoenaed . . . documents
> that it believed were necessary for this case from

Facebook and with that came a notarized statement. The Court did review the notarized statement that was set forth in the motion that was filed.

And the Court does find that that does self-authenticate pursuant to Evidence Rule 902. Specifically, subsection (h) which reads, "Documents accompanied by a certificate of acknowledgment executed in the manner provided by law or by a notary public . . . or other officer authorized by law to take acknowledgments."

So the Court does find that what was responded to by Facebook with respect to the warrant, based upon that notarized statement is, in fact, what was provided. So the Court does find that it – that the documents are authenticated.

In a separate oral opinion, the trial court addressed the admissibility of the Facebook records. The initial question examined by the court was whether the records related to an account belonging to T.M. The court found "very credible" testimony from Detective Jason Galiazzi linking both the unique internet address of the account and its public usernames, "R.B.T."[1] and "M.T.J." to T.M., and explaining the slang and nicknames in the records. Although the State did not move to qualify Galiazzi as an expert, he was questioned at length regarding his

---

[1] We use initials to protect T.M.'s identity. The record contains evidence the usernames used by T.M. would readily identify him in his community.

A-2883-17T2

training and experience. The court explained its findings with respect to T.M.'s control of the Facebook account:

> When I looked at all of the exhibits, there were three exhibits from the Facebook business records that stood out in my mind . . . . [T]here is a message from someone named [D.K.] to [R.B.T.] And it says, "What's your address?" . . . . And the response from [R.B.T.] is, ["123 Main St."][2]
>
> We know that at or about October of 2016 that's where [T.M.] lived. . . . I then looked at 56B . . . [a]nd the text is, "Happy birthday." The [date of the message] is xx-xx-2016[3] . . . and it's sent to or posted to [R.B.T.] And the user, [R.B.T.] text[s] back, "Thank you, Wya." We know that xx-xx is [T.M.'s] birthday . . . .
>
> And then we also have 58B. And towards the top of the page posted on 12-25-2016. . . . "L.M., T.M., Merry Christmas to my parents, Love you." And that is posted by [R.B.T.] And the response to that from L.M. is, "Merry Christmas, son. Love you. The struggle is over." And it goes on, there's back and forth. But we know that L.M. and T.M. are the parents of [T.M.], and that's another connection.

The court acknowledged T.M.'s argument his Facebook account had been hacked. However, the court found the only evidence offered in support of this contention, the testimony of T.M. and A.P.K., lacked credibility. In addition,

---

[2] A fictitious address is used to protect T.M.'s identity.

[3] The date, which is after the date of the shooting, is omitted to protect T.M.'s identity.

A-2883-17T2

the court noted it was unlikely that photographs of T.M., his family, and friends would appear in the records of the account after the alleged hacking.

With respect to admission of the Facebook messages pursuant to N.J.R.E. 803(b)(1), the court found "anything that says the author is [R.B.T.] can be moved into evidence under 803(b)(1) as the party's own statements . . . . [T]he Court has found that the State met its burden prima facie that [R.B.T.] is [T.M.], they're clearly statements of his." In addition, the court admitted the remaining Facebook records, concluding they were either business records pursuant to N.J.R.E. 803(c)(6) or not hearsay because they were offered "not for the truth of the matter asserted, but simply to show that these posts continued to be made" after the alleged hack.

At trial, the victim testified as follows: After T.M. started dating A.P.K., a contentious relationship developed between the victim, T.M., and T.M.'s brother. On the evening prior to the shooting, A.P.K. attended a small gathering at the victim's house. He and A.P.K. went to sleep in his bedroom at about midnight.

The victim was awakened between 6:00 a.m. and 7:00 a.m. by T.M. and his brother kicking open his bedroom door. As T.M. began assaulting the victim, A.P.K. rolled off the bed, got dressed, and fled. As the victim stood up, T.M.'s

A-2883-17T2

brother implied that the victim had kidnapped A.P.K. and demanded to know where he kept guns and money. When the victim moved toward his closet, T.M.'s brother shot the victim, with the bullet grazing the side of his head. As he lay on the floor drifting in and out of consciousness, the victim watched his attackers steal his possessions.

A.P.K. testified her statement to police identifying T.M. and his brother as being involved in the armed robbery was a lie. She recounted the relevant events as follows: On the evening before the shooting, she returned home from a party around 1:30 a.m. As she stood outside her home, the victim arrived and pulled her by her hair into his car and drove her to his home. She and the victim went to his bedroom where they argued and eventually fell asleep. A.P.K. left as soon as she awoke in the morning and did not witness a confrontation in the victim's bedroom. When asked about the Facebook records, A.P.K. acknowledged that photos associated with the account were of T.M. but testified that the account had been hacked.

According to the testimony of T.M., his paternal grandmother, B.D., and his parents, during the afternoon before the armed robbery, T.M. and his parents traveled to Jersey City to celebrate a family birthday. T.M. and his father spent the overnight hours at B.D.'s home. B.D. testified that on the morning of the

armed robbery, she awoke at 5:00 a.m. and saw T.M. and his father asleep in her living room. On cross-examination, B.D. admitted she sometimes has trouble remembering things, including T.M.'s full name. T.M. testified that he remained in the Jersey City area until around 7:00 p.m. on the day of the armed robbery.

T.M. testified that the Facebook account belonged to him until October 10, 2016, when it was hacked. He claimed he immediately told his family about the hack but did not inform his friends until a few weeks later. He claimed after October 10, 2016, he had no control over the account and did not post there.

On October 26, 2017, the court issued an oral decision adjudicating T.M. delinquent on all charges. The court found that the victim was one of the only non-law enforcement witnesses whose testimony was credible. Acknowledging that he had a prior weapons conviction, the court found the victim's recollection of the events believable and consistent with his statement to police.

The court found A.P.K.'s testimony to lack credibility, as it contradicted her earlier statement to police and other evidence presented at trial. The court did not believe the victim had kidnapped A.P.K., and found it more believable that she went to his house willingly and observed the robbery firsthand.

The court found T.M.'s claim that his Facebook account had been hacked to lack credibility. The court noted evidence the alleged "hacker" wrote

messages to T.M.'s mother, referring to her as "mom," and made references to his brother well after October 10, 2016, despite T.M.'s claim to have promptly notified his family of the hack. The court also discussed Facebook messages from T.M. detailing events leading up to and after the armed robbery, including between T.M. and his brother discussing their options if caught by police.

Finally, the court did not find credible T.M.'s alibi, which was inconsistent with time stamps of Facebook messages placing T.M. in Willingboro at the time of the armed robbery. For example, on October 22, 2016, at approximately 11:00 p.m., T.M.'s Facebook account message to a friend reads "Just got back out here," which the court found meant T.M. had returned to Willingboro from Jersey City. At 5:00 a.m. on October 23, 2016, at a time when T.M., his father, and grandmother testified he was sleeping in Jersey City, his Facebook account sent a message saying "We walkin'. I am on foot. We in Millbrook Note." Millbrook is a park located near the victim's home. The court concluded the State proved beyond a reasonable doubt T.M. was present at the victim's home at the time of the incident with the purpose of robbing and harming him.

At sentencing, the court merged the conspiracy charge with the robbery charge and sentenced T.M. to four years in the custody of the Juvenile Justice

Commission (JJC) for robbery, as well as concurrent three-year terms for burglary and the two weapons offenses.

This appeal followed.  T.M. makes the following arguments.

POINT I

THE COURT'S FINDING OF DELINQUENCY MUST BE REVERSED AND THE MATTER REMANDED SINCE THE COURT MISAPPLIED THE RELEVANT EVIDENCE RULES WHEN IT FOUND THE STATE PRESENTED PRIMA FACIE EVIDENCE THAT THE FACEBOOK ACCOUNT BELONGED TO T.M. AND ERRONEOUSLY ADMITTED THE COMMUNICATIONS INTO EVIDENCE.

A.  THE STATE DID NOT PRESENT PRIMA FACIE EVIDENCE THAT THE FACEBOOK ACCOUNT BELONGED TO T.M.

B.  THE FACEBOOK POSTS COULD ONLY HAVE BEEN SUBMITTED FOR [THEIR] TRUTH.

C.  THE BUSINESS RECORD EXCEPTION DOES NOT APPLY.

D.  THE FACEBOOK EVIDENCE IS MORE PREJUDICIAL TH[A]N PROBATIVE.

POINT II

DETECTIVE GALIAZZI[] WAS NEVER QUALIFIED AS AN EXPERT BY THE COURT, THEREFORE HIS TESTIMONY WAS INADMISSIBLE.

A-2883-17T2

POINT III

THE COURT'S FINDING OF DELINQUENCY WAS NOT SUPPORTED BY SUFFICIENT CREDIBLE EVIDENCE IN THE RECORD AND MUST BE REVERSED.

POINT IV

THE SENTENCE IMPOSED BY THE COURT WAS EXCESSIVE.

## II.

"In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" State v. Kuropchak, 221 N.J. 368, 385-86 (2015) (internal quotations omitted) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

In State v. Hannah, 448 N.J. Super. 78, 89 (App. Div. 2016), we held that "[w]e need not create a new test for social media postings" because N.J.R.E. 801 and 901 adequately address the question of their admissibility. We explained:

> [a]uthenticity can be established by direct proof – such as testimony by the author admitting authenticity – but direct proof is not required. "A prima facie showing may be made circumstantially. Such circumstantial

11

proof may include demonstrating that the statement divulged intimate knowledge of information which one would expect only the person alleged to have been the writer or participant to have."

[Id. at 90 (internal quotations and citations omitted) (quoting Konop v. Rosen, 425 N.J. Super. 391, 411 (App. Div. 2012)).]

Also, "under the reply doctrine, a writing 'may be authenticated by circumstantial evidence establishing that it was sent in reply to a previous communication.'" Ibid. (quoting State v. Mays, 321 N.J. Super. 619, 629 (App. Div. 1999)). In a bench trial, "considering the judge's dual role with regard to its admission and weight, the better practice . . . will often warrant the admission of the document [followed by] a consideration by the judge, as factfinder" of its evidentiary value. State v. Tormasi, 443 N.J. Super. 146, 157 (App. Div. 2015).

Having carefully reviewed the record in light of these principles, we find no abuse of discretion in the trial court admitting the records of T.M.'s Facebook account, its determination that T.M. was the person communicating under the user names associated with the account, or its rejection of T.M.'s claim that the account had been hacked prior to the armed robbery. The record contains ample support for each of these conclusions.

We also find no error in the trial court's determination regarding the admissibility of the Facebook records over T.M.'s hearsay objections. The

A-2883-17T2

records are business records of Facebook that were "made in the regular course of business[,] and it was the regular practice of that business to make" them. N.J.R.E. 803(c)(6).[4] In addition, the messages from T.M. relating to the armed robbery, his geographic proximity to the crimes, and his attempt to sell the victim's stolen property are T.M.'s own statements admissible against him as an exception to hearsay. N.J.R.E. 803(b)(1).

Nor do we find the Facebook records should not have been admitted because their probative value was substantially outweighed by the risk of undue prejudice. N.J.R.E. 403. The probative value of the records is strong, given that they link T.M. to the crimes both directly and through geographic proximity. The risk of undue prejudice, on the other hand, is limited in a bench trial where the court is well equipped to determine the weight to give evidence when making fact findings.

## III.

Because the question of Galiazzi's qualifications as an expert was not raised in the trial court, we review T.M.'s arguments under a plain error standard. State v. Ross, 229 N.J. 389, 407 (2017). Our inquiry is to determine whether

---

[4] Citations to the New Jersey Rules of Evidence are from the version of the rules prior to the revisions effective July 1, 2020.

A-2883-17T2

the alleged error was "clearly capable of producing an unjust result . . . ." R. 2:10-2. Under this standard, reversal is required if there was an error "sufficient to raise a reasonable doubt as to whether [it] led [the court] to a result it otherwise might not have reached." State v. Green, 447 N.J. Super. 317, 325 (App. Div. 2016) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

"If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701. Pursuant to this rule, "[c]ourts in New Jersey have permitted police officers to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary." State v. Kittrell, 279 N.J. Super. 225, 235 (App. Div. 1995) (alteration in original) (quoting State v. LaBrutto, 114 N.J. 187, 198 (1989)); see also State v. De Luca, 325 N.J. Super. 376, 393 (App. Div. 1999) (holding that a police officer could testify that footprints left in the snow were similar to the defendant's boots); Trentacost v. Brussel, 164 N.J. Super. 9, 19-20 (App. Div. 1978) (holding that a detective who investigated between seventy-five and one hundred crimes in a particular

neighborhood over a three-year period could offer lay opinion testimony that the neighborhood was a high-crime area).

If the testimony exceeds the bounds of proper lay opinion, by utilizing the officer's "experience, training, [and] education[,]" the officer should be qualified as an expert. Kittrell, 279 N.J. Super. at 236; N.J.R.E. 702. However, if a proper foundation establishes the officer's specialized experience and training on the matter, and there is enough evidence to qualify the officer as an expert, any error in failing to qualify the officer as an expert should be considered harmless. 279 N.J. Super. at 236; see also State v. Hyman, 451 N.J. Super. 429, 448-50 (App. Div. 2017) (finding that although interpretation of "street slang" should have been reserved for expert testimony, police lay witness interpretation of street slang was harmless because the testifying officer could have been qualified as an expert based on his training and experience).

Galiazzi provided in-depth testimony about the Facebook investigation and the intricacies of social media, usernames, and internet addresses. He also explained the common meaning of nicknames and slang terms used in the Facebook records. This testimony called upon Galiazzi's experience, training, or education and should have been presented only after the trial court qualified

him as an expert. Hyman, 451 N.J. Super. at 448-49; Kittrell, 279 N.J. Super. at 236.

However, the record contains detailed testimony establishing the officer's specialized experience and training on the matters about which he testified to qualify him as an expert. Also, each time Galiazzi was asked to translate an abbreviation or slang in the Facebook records, he answered based on his "training and experience on undercover investigations and the use of slang and abbreviations in text messages." Based on this record, we conclude any error in failing to qualify Galiazzi as an expert was harmless.

## IV.

We do not agree with T.M.'s argument that the trial court's adjudication of delinquency was not supported by sufficient credible evidence in the record. Appellate review of a trial court's factual findings in a juvenile delinquency trial is extremely narrow. State ex rel. S.B., 333 N.J. Super. 236, 241 (App. Div. 2000). We "give deference to those findings of the trial judge which are substantially influenced by his or her opportunity to hear and see the witnesses and have the 'feel' of the case . . . ." Ibid. (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). Thus, we must determine whether the trial court findings were based on "sufficient credible evidence present in the record as a whole." Ibid.

16

We will disturb the trial court decision only if it was "clearly a mistaken one and so plainly unwarranted that the interest of justice demand[s] intervention and correction . . . ." Ibid.

Our careful review of the record uncovered ample evidence supporting the trial court's adjudication of delinquency. The victim, who was familiar with T.M., identified him as an assailant. A.P.K. also identified T.M. as a participant in the crimes, a statement she attempted to recant at trial in testimony the court found to be lacking in credibility. T.M.'s attempt to insulate himself from the inculpatory messages on his Facebook account by claiming the account was hacked was rejected by the trial court, which had the opportunity to evaluate the veracity of his testimony. T.M.'s alibi was contradicted by his Facebook messages admitting he was near the victim's home at the time of the shooting, and in possession of the victim's stolen property.

## V.

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). We are to affirm a sentence, even if we would have imposed a different one, so long as the sentencing judge "properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Natale, 184 N.J. 458, 489 (2005)

(quoting State v. O'Donnell, 117 N.J. 210, 215 (1989)). "In general, a trial court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." O'Donnell, 117 N.J. at 215.

We must affirm a sentence "unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). "An appellate court may also remand for resentencing if the trial court considers an aggravating factor that is inappropriate to a particular defendant or to the offense at issue." Ibid.

Where a juvenile has been adjudicated delinquent, the trial court may, after analyzing the factors enumerated in N.J.S.A. 2A:4A-43(a) and N.J.S.A. 2A:4A-44(a), exercise its discretion to order incarceration or other alternative sentencing. N.J.S.A. 2A:4A-43(b). If the court imposes a term of imprisonment, it must "state on the record the reasons for imposing incarceration, including

any findings with regard to [the] factors" enumerated in the applicable sentencing statutes. N.J.S.A. 2A:4A-44(d)(1). A first-degree crime other than murder carries a maximum four-year term of incarceration. N.J.S.A. 2A:4A-44(d)(1)(c).

The trial court found seven aggravating factors and one mitigating factor were present. N.J.S.A. 2A:4A-44(a)(1)(a), (c), (d), (g), (i), (j), (l); N.J.S.A. 2A:4A-44(a)(2)(g). The court analyzed each factor, including T.M.'s history of criminal convictions, in detail. The court noted that T.M.'s juvenile history began when he was eleven. He received two JJC diversions, one for disorderly conduct, the other for fourth-degree shoplifting and disorderly conduct. He was subsequently adjudicated delinquent for third-degree burglary and placed on probation for a year. He violated his probation by being adjudicated delinquent for second-degree robbery and third-degree conspiracy. In February 2016, shortly before the present offenses, T.M. was adjudicated delinquent for second-degree aggravated assault. He was subsequently adjudicated delinquent for disorderly conduct. Finally, while he was on a ankle bracelet for the present offenses, T.M. was charged as an adult with third-degree aggravated assault, an offense to which he entered a guilty plea.

19

T.M. argues the trial court should have considered mitigating factors (c), N.J.S.A. 2A:4A-44(a)(2)(c) ("[t]he juvenile did not contemplate that the juvenile's conduct would cause or threaten serious harm.") and (e), N.J.S.A. 2A:4A-44(a)(2)(e) ("[t]here were substantial grounds tending to excuse or justify the juvenile's conduct"). We see no error in the trial court not finding these mitigating factors. The record belies any claim that T.M. did not contemplate that a home-invasion armed robbery could cause or threaten serious harm to the victim. Nor is there evidence tending to excuse or justify T.M.'s conduct. The trial court found A.P.K.'s claim that she had been kidnapped to lack credibility. In addition, even if T.M. had thought he was rescuing A.P.K. from the victim, such a belief would not explain the theft of the victim's property, or why T.M. did not call police to report A.P.K.'s abduction instead of attempting an armed intervention to save her with his brother.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20