# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1374-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHARLES N. ARCANO,

     Defendant-Appellant.

_____

> Argued February 12, 2025 – Decided June 10, 2025
>
> Before Judges Rose and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 19-10-2483.
>
> Colin Sheehan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Colin Sheehan, of counsel and on the brief).
>
> Ashlea D. Newman, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Ashlea D. Newman, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Charles N. Arcano of sexually assaulting Valerie,[1] a twenty-two-year-old stranger he encountered at the Philadelphia train stop in the early morning hours of January 27, 2019. The State's theory at trial was that the assaults occurred during the train ride "in diverse jurisdictions between Collingswood and Lindenwold on the PATCO High Speed Line." The acts were partially captured on the train's surveillance cameras. Defendant did not deny the encounter; he claimed the victim consented.

The State's proofs at trial included the testimony of: Valerie, who detailed her recollection of the incident in view of her intoxicated state; Valerie's best friend, Jill, who corroborated Valerie's intoxication and testified as a fresh-complaint witness; and Lynn Turt, R.N., a sexual assault nurse examiner (SANE), who was qualified as an expert in forensic sexual assault nursing and testified about the examination she performed on Valerie several hours after the incident. The State also played the train's surveillance footage for the jury.

Defendant did not testify or call any witnesses on his behalf. He was sentenced to an aggregate prison term of eighteen years, Megan's Law reporting requirements, N.J.S.A. 2C:7-1 to -23, and parole supervision for life, N.J.S.A.

---

[1] We use pseudonyms to protect the victim's privacy. R. 1:38-3(c)(12).

2C:43-6.4. Defendant was forty-six-years old at the time of the incident with no prior convictions.

On appeal, defendant raises the following points for our consideration:

POINT I

THE COURT'S ERRONEOUS ADMISSION OF HEARSAY TESTIMONY ON THE KEY DISPUTED ISSUE OF CONSENT DENIED [DEFENDANT] OF HIS RIGHTS TO A FAIR TRIAL AND DUE PROCESS.

    A.  The hearsay does not fit the medical treatment exception because it was obtained for evidence gathering.

    B.  The hearsay does not fit the medical treatment exception because it is irrelevant to treatment.

POINT II

THE PROSECUTOR COMMITTED REVERSIBLE MISCONDUCT ON SUMMATION BY MAKING COMMENTS WITHOUT SUPPORT IN THE RECORD AND MISREPRESENTING THE KEY DISPUTED ISSUE OF CONSENT.
(Not raised below)

    A.  The prosecutor committed reversible misconduct by misrepresenting the key disputed issue of consent.

    B.  The prosecutor committed reversible misconduct by repeatedly making comments without support in the record.

A-1374-22

## POINT III

THE FRESH COMPLAINT TESTIMONY WAS IRRELEVANT TO ITS PURPORTED PURPOSE AND ITS ADMISSION DENIED [DEFENDANT] OF HIS RIGHTS TO A FAIR TRIAL AND DUE PROCESS.

## POINT IV

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED [DEFENDANT] A FAIR TRIAL.
(Not raised below)

## POINT V

[DEFENDANT]'S SENTENCE MUST BE REVERSED AND HIS CASE REMANDED FOR RESENTENCING BECAUSE THE TRIAL COURT ERRONEOUSLY RAN EACH SENTENCE CONSECUTIVELY WITHOUT SUPPORT IN THE RECORD.
(Not raised below)

Based on our review of the record and applicable legal principles, we reject the contentions raised in points I through IV. We therefore affirm defendant's convictions. Persuaded by some of the claims raised in point V, we remand for resentencing.

I.

Around 8:00 p.m. on January 26, 2019, Valerie arrived at Jill's apartment in Collingswood where both women and a group of friends began consuming

4

alcohol before they took a ridesharing service to Philadelphia. Testimony at trial regarding the precise quantity of alcohol Valerie consumed varied. Suffice it to say, Valerie consumed about five or six vodka beverages at Jill's apartment, two or three vodka beverages at the first club in Philadelphia, one vodka beverage and "a little bit of beer that belonged to [Jill]" at the second club.

Around 2:50 a.m., Valerie and Jill headed home. Because they separated from their friends and their phone batteries had died, Valerie and Jill took the train back to Collingswood. Valerie testified that when they arrived at a Philadelphia train station near the second club, she was feeling "extremely drunk." Valerie explained "[she] just wasn't clear-headed." Instead, she was "kind of stumbling [while] walking"; "slurring [her] words"; "and getting very tired."

Valerie further testified while they were waiting for the train, defendant approached Valerie and offered his coat. Valerie, who was wearing a tank top bodysuit without an outer garment, accepted defendant's offer. When the train arrived, Valerie, Jill, and defendant boarded. Valerie fell asleep during the ride.

Jill testified when the train arrived at the Collingswood stop at around 4:45 a.m., Jill attempted to awaken Valerie by shaking her. Initially unresponsive, Valerie eventually woke up. Assuming Valerie was behind her,

Jill disembarked. But Valerie moved too slowly and was unable to exit the train with Jill.

Valerie testified when she realized she was alone on the train and did not know how to get home, she panicked and began crying. Immediately thereafter, defendant approached Valerie and said, "everything was going to be okay" and he could "get [her] home." Valerie testified defendant placed his arm around her "and it just got sexual." Valerie detailed the "sexual things" defendant said. She also claimed he "touched all around [her] body."

Valerie testified defendant pulled down her bodysuit exposing her breasts. He then "lick[ed her] breasts and put[] his hands down [her] pants into [her] vagina . . . multiple times throughout the entire train ride." Defendant touched the inside of her vagina about five or six times and placed her hand on his penis. "[Valerie] kept falling asleep" and when she awoke she "would try to stop it" but "[she] was falling in and out of consciousness." Valerie told defendant to stop about five or six times.

At various points, Valerie got up to look for her phone and defendant followed her. When Valerie eventually sat down, defendant sat next to her and resumed touching her body. Valerie testified she felt there was nothing she

6

could do to get away from defendant. She maintained she did not consent to defendant's conduct.

On cross-examination, Valerie acknowledged she did not scream while she was on the train. Nor did she "try to get off at any of the other stops." Valerie also confirmed she did not "signal to anyone that [she was] in need of help."

Around 5:15 a.m., the train again stopped at Collingswood. Valerie testified she immediately disembarked, still wearing defendant's jacket. Defendant followed and told Valerie he would help her get home. Valerie asserted she told defendant to leave her alone and returned his jacket. Defendant seemed "annoyed" but did not follow her.

Thereafter, Valerie encountered Tom, a man she did not know, in the parking lot. Tom testified he asked Valerie whether she was okay. Valerie smelled like "stale beer," was crying, and asked Tom to call a ridesharing service for her. Tom complied and Valerie returned to Jill's apartment.

Valerie testified Jill was not home when she arrived at the apartment. One of their friends told Valerie that Jill and the rest of the group were out searching for her.

A-1374-22

Jill testified that when she returned to the apartment, Valerie was "inconsolable." Jill asked Valerie what happened and Valerie disclosed defendant "fingered her"; "kiss[ed] her on her neck"; and "touched her breasts."

Around 6:50 a.m., Valerie called the Delaware River Port Authority to report the incident and was told to respond to headquarters. Valerie provided a statement to police, who thereafter brought her to the hospital where a nurse performed "the rape kit." Valerie explained the nurse examined her vagina and swabbed her body.

Turt conducted the SANE examination on Valerie. Turt testified the purpose of a SANE examination "is to identify any evidence that we can obtain, DNA samples, for instance, and . . . evidence of injury to the victim." Turt acknowledged the examination "include[s] treatment for those injuries."

Turt was on call the day of Valerie's examination and met Valerie in the hospital's emergency room. Turt detailed the examination she performed, which she described as "a complete head-to-toe assessment of the patient looking for evidence of any injury whatsoever," such as, "scrapes, cuts, [or] bruises." Quoting her report, Turt testified Valerie disclosed the "history of what occurred," which guided her examination:

> This guy comes over and sat next to me. He put his hands down my pants and fingered me. Then he

pulled down my tank top and started licking and sucking my left breast. <u>I kept telling him to stop, but he just kept it up</u>. <u>I was so drunk</u>. I didn't know what to do. He also kept putting my hand on top of his penis on the outside of his clothes.

[(Emphasis added).]

## II.

In his first point on appeal, defendant argues the trial court erroneously admitted Turt's testimony regarding Valerie's hearsay statements emphasized above, i.e., Valerie "'was so drunk' and 'kept telling [defendant] to stop, but he just kept it up." Defendant argues this testimony does not fit within the medical treatment hearsay exception because Valerie's examination was made for evidence gathering and not for medical treatment purposes. He further argues the exception does not apply because the statements were not relevant to Valerie's diagnosis and treatment and were "particularly prejudicial because [they] bolstered [her] credibility on the key disputed issue of consent."

Prior to trial, defendant moved in limine to preclude Turt from generally testifying about Valerie's hearsay statements "regarding the alleged assault," defendant's identity, and her level of intoxication, contending they were inadmissible under N.J.R.E. 803(c)(4). Defendant alternatively argued if the court deemed some of Valerie's hearsay statements "admissible under N.J.R.E.

803(c)(4), her testimony must be limited to the sexual acts necessary for diagnostic purposes without excessive details to avoid unduly bolstering [her] credibility."

During oral argument before the trial court, the prosecutor proffered the State sought to admit Valerie's statements to Turt regarding "her own intoxication and losing consciousness," and "the acts that were perpetrated on her." The prosecutor argued those statements were relevant to Turt's potential diagnoses and treatment and, as such, they were inherently reliable under the applicable law.

In an oral decision, the court granted defendant's application to preclude testimony about his identity, finding that information "not relevant to diagnosis or treatment." However, the court determined the State's proffered testimony concerning Valerie's disclosure to Turt "about areas of the body and what happened to those areas" was "reasonably pertinent to diagnosis or treatment" and therefore admissible under N.J.R.E. 803(c)(4).

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. N.J.R.E. 801(c). Statements made for the purpose of medical

diagnosis or treatment are exceptions to the hearsay rule under N.J.R.E. 803(c)(4), which provides, in full:

> A statement that: (A) is made in good faith for purposes of, and is reasonably pertinent to, medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

Our Supreme Court has long recognized "the declarations of a patient as to his [or her] condition, symptoms and feelings made to his [or her] physician for the purpose of diagnosis and treatment are admissible in evidence as an exception to the hearsay rule." Cestero v. Ferrara, 57 N.J. 497, 501 (1971). "The traditional rationale for that departure from the hearsay rule is that such statements possess inherent reliability because 'the patient believes that the effectiveness of the treatment he [or she] receives may depend largely upon the accuracy of the information he [or she] provides the'" medical professional. R.S. v. Knighton, 125 N.J. 79, 87 (1991) (quoting K. Brown et al., McCormick on Evidence § 292, at 839 (3d ed. 1984)).

Because this hearsay exception is based on a presumed "treatment motive," a statement by a declarant who "is unaware that his or her statements will enable a physician to make a diagnosis and administer treatment" lacks the requisite degree of trustworthiness to qualify under this exception. See R.S.,

125 N.J. at 87-88. Accordingly, hearsay obtained during evidence gathering and medical consultations conducted purely in preparation for litigation remains inadmissible. State in the Int. of C.A., 201 N.J. Super. 28, 33-34 (App. Div. 1985) (holding a statement was inadmissible under Evid. R. 63(12), the predecessor of N.J.R.E. 803(c)(4), because the evidence at trial did not establish "the girl believed that the doctor was questioning her so that he could treat her"); see also State v. Pillar, 359 N.J. Super. 249, 289 (App. Div. 2003) (recognizing where a doctor's examination "was conducted for evidence gathering purposes, the hearsay statements contained in the medical history would be inadmissible" under N.J.R.E. 803(c)(4)). Thus, "ordinarily statements as to the cause of the symptoms or conditions" are not admissible, Cestero, 57 N.J. at 501, because they are not relevant to the patient's treatment, State v. McBride, 213 N.J. Super. 255, 273 (App. Div. 1986).

We apply a deferential standard of review to the trial court's evidentiary rulings. See State v. Garcia, 245 N.J. 412, 430 (2021). We will only reverse if the court's evidentiary rulings were "so wide of the mark that a manifest denial of justice resulted." State v. Kuropchak, 221 N.J. 368, 385 (2015) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). If we determine the court mistakenly exercised its discretion, "we must then determine whether any error found is

harmless or requires reversal." State v. Gonzalez, 249 N.J. 612, 633 (2022) (quoting State v. Prall, 231 N.J. 567, 581 (2018)).

In the present matter, Valerie testified she was subjected to a "rape kit" procedure but she was not directly asked the purpose of Turt's examination. Conversely, Turt testified the SANE examination had a dual purpose: to gather evidence and treat any injuries sustained by the victim. Turt also testified she took Valerie's medical history to guide her examination. We discern no abuse of discretion in the court's decision admitting the brief history provided by Valerie, which disclosed the parts of her body that were assaulted. The nature of the sexual acts was necessary for diagnostic purposes because it informed Turt's decision as to the type of testing and examination required. Indeed, defendant does not challenge the admission of the statements.

However, Valerie's disclosures to Turt, "I kept telling him to stop, but he just kept it up" and "I was so drunk," were not admissible under N.J.R.E. 804(c)(4) as these statements were irrelevant to her diagnosis and treatment. They do not describe Valerie's medical history, past or present symptoms, or their inception.

Nonetheless, we discern no harmful error resulting in a manifest denial of justice by their admission through Turt's testimony. Valerie's out-of-court

statements to Turt were fleeting, amplified more extensively during her trial testimony, and subjected to cross-examination. At worst, the admission of this hearsay was merely cumulative of Valerie's testimony at trial that she was intoxicated and unsuccessfully attempted to convince defendant to stop assaulting her, and Jill's testimony regarding Valerie's state of intoxication. We therefore reject defendant's argument that the admission of these hearsay statements warrants reversal of his convictions.

III.

For the first time on appeal, in his second point, defendant argues the prosecutor's closing remarks deprived him of a fair trial. Defendant first argues the prosecutor "misrepresent[ed] the key disputed issue of consent" by playing the train surveillance video and arguing, "[t]his is not consent." In particular, defendant now claims the following comments were out of bounds:

> This is not consent. [Valerie and defendant ha]ve been on that train for six minutes now. Ask yourselves. Have you seen a kiss, have you seen a touch from her? Have you seen any type of physical affection towards him from her? How do sexual encounters start in the movies, on TV, in your regular lives? They start with a kiss, a mutual kiss, don't they? Isn't that what you know from your regular life? Have you seen them kiss? Have you seen anything like that? Have you even seen more than three minutes of conversation?

A-1374-22

Defendant further contends the prosecutor's repeated remarks about the encounter, including "seven moments in the surveillance footage where [Valerie] allegedly said, 'stop,'" were not supported by the record. Finally, defendant argues the prosecutor inappropriately suggested defendant was riding the train all night searching for a victim by showing the jurors the pre-incident surveillance footage of him riding the train throughout the night.

"New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters, observing that the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting State v. Smith, 212 N.J. 365, 402-03 (2012)). "Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). They may even do so "graphically and forcefully." State v. Pratt, 226 N.J. Super. 307, 323 (App. Div. 1988).

"[P]rosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83. "Even if the prosecutor exceeded the bounds of proper conduct, however, that finding does not end our inquiry." Williams, 471

15

N.J. Super. at 45. We will only reverse if the misconduct was "so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83.

"Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." State v. R.B., 183 N.J. 308, 333 (2005) (quoting Frost, 158 N.J. at 83). "Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made," and "deprives the court of the opportunity to take curative action." State v. Timmendequas, 161 N.J. 515, 576 (1999). Proper curative instructions generally remove the potential prejudice resulting from improper closing remarks. See Smith, 212 N.J. at 409.

We review the prosecutor's closing remarks "within the context of the trial as a whole." State v. Feaster, 156 N.J. 1, 64 (1998). Because defendant did not object to the prosecutor's summation remarks, we review for plain error. R. 2:10-2; see also State v. Ross, 229 N.J. 389, 407 (2017).

With these principles in view, we consider the prosecutor's remarks within the context of the evidence adduced at trial and defense counsel's summation. Throughout her closing remarks, defense counsel argued the sexual encounter between Valerie and defendant was consensual. Generally referencing the video surveillance footage, defense counsel argued the train's "doors open[ed] nine

times during the course of this interaction and there [wa]s zero attempt made by [Valerie] to leave. This was consensual." Displaying two still photos from the train surveillance video footage, defense counsel described the images depicted and claimed Valerie "could have gotten away from [defendant]" but followed him at one point during the ride. Defense counsel again argued, "[t]his is consensual."

In that context, the prosecutor's remarks that Valerie's behavior did not suggest consent were a fair response to defense counsel's emphatic argument that the encounter was consensual. Further, the prosecutor's suggestion that the jurors should use their common experiences to determine consent was fair comment and consistent with the trial court's ensuing instructions. Indeed, immediately after the remarks at issue, the prosecutor told the jurors the judge would issue an instruction concerning "the law on consent and what that means. She does not have an affirmative duty to resist. . . . Consent can be inferred from the body language and from all the other factors at play."

Moreover, in its final instructions to the jury, consistent with the model jury charges the court twice explained "affirmatively given permission." See Model Jury Charges (Criminal), "Sexual Assault (Force/Coercion) (N.J.S.A. 2C:14-2(c)(1))" (rev. Jan. 24, 2005); Model Jury Charges (Criminal), "Criminal

17

Sexual Contact (N.J.S.A. 2C:14-3(b))" (rev. June 11, 2012). As part of those instructions, the court explained, "[p]ermission to engage in an act of sexual contact can be and, indeed, often is indicated through physical actions rather than words." See ibid. That instruction was consistent with the court's explanation of circumstantial evidence and inferences, i.e., "[w]hether or not inferences should be drawn is for you to decide using your own common sense, knowledge and everyday experience." See Model Jury Charges (Criminal), "Criminal Final Charge" (rev. Sept. 1, 2022).

Nor are we persuaded the prosecutor impermissibly argued facts not in evidence. Valerie testified that she told defendant to stop several times during the train ride. During summation, acknowledging the surveillance footage did not contain audio, the prosecutor referenced Valerie's testimony and suggested to the jury those portions of the footage where Valerie said "stop." For example, the prosecutor argued: "We can't hear it, but wouldn't this make sense if this is one of the times she's telling him to stop the four to five times on this train?" Later, the prosecutor argued: "I submit to you every time you see that pause, that stop, is when she says, 'stop,' to him and he stops for a few seconds and then he's right back at it." These comments were reasonable inferences from the evidence adduced at trial. See Frost, 158 N.J. at 85.

Finally, the prosecutor's remarks concerning defendant's motive for riding the train for an extended period that night were tethered to the video evidence and simply asked the jurors to reach their own conclusions. The prosecutor did not expressly comment on defendant's motive.

Given the lack of objections, we conclude no unjust result occurred from any of the remarks defendant belatedly challenges. See R. 2:10-2.

IV.

In his third point, defendant reprises his challenge to Jill's fresh complaint trial testimony. Defendant maintains Jill's fresh complaint testimony and the accompanying jury charge were not warranted because "[Valerie] almost immediately reported the incident to police."

The fresh complaint doctrine permits the State to admit "evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015). "[T]o qualify as fresh complaint, the victim's statements to someone she [or he] would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary." State v. Hill, 121 N.J. 150, 163 (1990). "Only the facts that are minimally necessary to identify the

subject matter of the complaint should be admitted; the fresh-complaint testimony is not to be used 'to corroborate the victim's allegations concerning the crime.'" R.K., 220 N.J. at 456 (quoting State v. Bethune, 121 N.J. 137, 146 (1990)).

Prior to trial, the State moved to admit Valerie's disclosure about the assaults to Jill. Pursuant to the parties' agreement, the court considered the transcripts of Valerie's and Jill's statements to law enforcement in lieu of conducting an N.J.R.E. 104 hearing. Immediately following oral argument, the judge issued a decision granting the State's application.

Recognizing Valerie's disclosure occurred during a "compressed time frame," the court nonetheless found the testimony relevant because Valerie "was around other people before saying anything to the police about what happened." Turning to Hill's three-part test, the court recognized there was "no question" Jill was someone Valerie "would ordinarily turn to for support." The court further found there was "no dispute" that Valerie's disclosure "was made within a reasonable time after the alleged assault." Rather, the court found the dispositive issue was whether the disclosure "was made voluntarily and spontaneously."

A-1374-22

Citing Jill's statement, the court noted Jill returned to her apartment after she was unable to locate Valerie at the train station. Jill encountered Valerie in Jill's bedroom and "f[ound] her friend hysterical, hyperventilating, [having a] panic attack, practically." Jill asked Valerie open ended questions, including: "[d]id you get off the train;" "[w]hat happened"; and "[a]re you okay." The court deemed Jill's ensuing question, "[d]id anything happen with that guy," a "hybrid question." Noting Jill stated Valerie "didn't want to talk about it," the court further observed Jill conveyed Valerie then disclosed what occurred.

The court concluded although Jill initiated the questioning, she did not ask Valerie about any specific acts that might have occurred and, as such, Jill did not contravene the governing law. Based on the totality of the circumstances, the court permitted Jill's fresh complaint testimony. However, the court limited the prosecutor's examination to leading questions "to avoid disclosure of too much detail" provided by Valerie to Jill. In addition, after the evidence was admitted at trial, the court instructed the jury not to consider the testimony for its truth but instead to refute any suggestion Valerie "delayed" disclosure rendered her incredible. The court repeated the instruction in its final charge. See Model Jury Charges (Criminal), "Fresh Complaint" (rev. Feb. 5, 2007).

We have considered defendant's contentions in view of the applicable law, and conclude they lack sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2). We affirm substantially for the reasons set forth by the trial court in its well-reasoned decision. We therefore discern no abuse of discretion in the court's decision admitting Jill's fresh complaint testimony.

V.

In view of our disposition on points I through III, we reject defendant's contention, raised in point IV, that the cumulative effect of the errors asserted warrant reversal. Defendant has failed to demonstrate any error or pattern of errors, rising to the level, either singly or cumulatively, that denied him a fair trial. "A defendant is entitled to a fair trial but not a perfect one." R.B., 183 N.J. at 334.

VI.

Lastly, we consider defendant's excessive sentencing argument. Defendant challenges the court's imposition of consecutive terms, contending the record does not support the court's application of the factors set forth in State v. Yarbough, 100 N.J. 627, 644 (1985). Defendant does not challenge the court's imposition of aggravating and mitigating factors.

22

Ordinarily, we defer to the sentencing court's determination, State v. Fuentes, 217 N.J. 57, 70 (2014), and do not "substitute [our] judgment" for that of the sentencing court, State v. Case, 220 N.J. 49, 65 (2014). We will not disturb a sentence that is not manifestly excessive or unduly punitive, does not constitute an abuse of discretion, and does not shock the judicial conscience. See State v. O'Donnell, 117 N.J. 210, 215-16 (1989). However, our deference "applies only if the trial judge follows the Code [of Criminal Justice] and the basic precepts that channel sentencing discretion." Case, 220 N.J. at 65.

"[T]rial judges have discretion to decide if sentences should run concurrently or consecutively." State v. Miller, 205 N.J. 109, 128 (2011); see also N.J.S.A. 2C:44-5(a). Judges are permitted to impose consecutive sentences where multiple sentences of imprisonment are imposed and after considering the Yarbough factors. "A sentencing court must explain its decision to impose concurrent or consecutive sentences in a given case." State v. Cuff, 239 N.J. 321, 348 (2019). "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." Miller, 205 N.J. at 129.

In Yarbough, our Supreme Court set forth the following "criteria as general sentencing guidelines for concurrent or consecutive sentencing decisions":

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous;
>
> (4) there should be no double counting of aggravating factors; [and]

24

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .[2]

[100 N.J. at 643-44.]

Similar to the statutory aggravating and mitigating factors, "[t]he Yarbough factors are qualitative, not quantitative," and "applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348. Instead, the sentencing court must consider all the Yarbough guidelines, with emphasis on the five subparts of the third guideline. State v. Rogers, 124 N.J. 113, 121 (1991).

"[I]n determining whether sentences for separate offenses should be served concurrently or consecutively, a sentencing court should focus on the fairness of the overall sentence." State v. Miller, 108 N.J. 112, 121 (1987); see also State v. Torres, 246 N.J. 246, 267-68 (2021) (reiterating Yarbough requires the trial court to place on the record a statement of reasons for imposing consecutive sentences, which should address the overall fairness of the sentence). "Consecutive sentences are not an abuse of discretion when separate

---

[2] A sixth factor, imposing an overall outer limit on consecutive sentences, was superseded by statute. See State v. Eisenman, 153 N.J. 462, 478 (1998) (citing N.J.S.A. 2C:44-5(a)).

crimes involve separate victims, separate acts of violence, or occur at separate times." State v. Copling, 326 N.J. Super. 417, 441 (App. Div. 1999). Conversely, "[w]here separate crimes grow out of the same series of events or from the same factual nexus, consecutive sentences are not imposed." State v. Lester, 271 N.J. Super. 289, 293 (App. Div. 1994).

In the present matter, the jury convicted defendant of five sexual offenses charged in a seven-count Camden County indictment: first-degree aggravated sexual assault by digital penetration, knowing the victim was physically helpless, N.J.S.A. 2C:14-2(a)(7) (count one); second-degree sexual assault by digital penetration, by using physical force, N.J.S.A. 2C:14-2(c)(1) (count two); third-degree aggravated criminal sexual contact by touching the victim's vagina knowing the victim was physically helpless, N.J.S.A. 2C:14-3(a) (count four); fourth-degree criminal sexual contact by touching the victim's breasts by physical force, N.J.S.A. 2C:14-3(b) (count five); and fourth-degree criminal sexual contact by licking the victim's breasts by physical force, N.J.S.A. 2C:14-3(b) (count six). The jury acquitted defendant of third-degree aggravated criminal sexual contact by touching the victim's buttocks knowing the victim was physically helpless, N.J.S.A. 2C:14-3(a) (count three); and fourth-degree

criminal sexual contact by placing the victim's hand on defendant's penis by physical force, N.J.S.A. 2C:14-3(b) (count seven).[3]

The trial court found and assigned minimal weight to aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense), and nine, N.J.S.A. 2C:44-1(a)(9) (general and specific deterrence). The court also found and assigned substantial weight to mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (absence of prior juvenile or criminal history). On balance, the court found "the mitigating factor outweigh[ed] the aggravating factors and justifie[d] a sentence below the middle of the range for the most serious offense and at the bottom of the range for the three other offenses." See N.J.S.A. 2C:43-6(a)(1) (providing a term of imprisonment "between [ten] and [twenty] years" for first-degree offenses); N.J.S.A. 2C:43-6(a)(3) (providing a term of imprisonment "between three and five years" for third-degree offenses); and N.J.S.A. 2C:43-6(a)(4) (providing the term "fixed by the court . . . shall not exceed [eighteen] months").

---

[3] We glean from the parties' appellate submissions, in September 2019, the grand jury initially charged defendant in an eight-count indictment, with the same offenses charged in the October 2019 indictment and presented to the petit jury, except the September 2019 indictment also charged third-degree criminal restraint, N.J.S.A. 2C:13-2(a), in count eight. The October 2019 indictment also removed certain charging language which is not at issue on this appeal.

In its assessment of the Yarbough factors, the trial court found subparts (a) and (d) of the third guideline favored imposition of concurrent sentences. As to subpart (a), the court found "the crimes and their objectives were not predominantly independent of each other." See Yarbough, 100 N.J. at 644. The court reasoned "[a]ll of the offenses consisted of sexual crimes whose objectives were the exploitation of the victim and the gratification of the defendant." As to subpart (d), the court recognized there was a single victim.

The trial court determined the remaining subparts of the third Yarbough guideline favored consecutive sentences. Regarding subpart (b), "the crimes involved separate acts of violence or threats of violence," see ibid., the court found "all of the offenses were assaultive and violent in the sense that they each constituted separate attacks on the victim's bodily [sic], integrity and dignity." Turning to subpart (c), the court stated, "while the crimes were committed in the same place on the same night, they do not constitute 'a single period of abhorrent behavior,'" see ibid., "but rather a prolonged three-hour series of separate instances of exploitation and degradation of a helpless victim." (Emphasis added). As to subpart (e), the court found there were "four sentences to be imposed."

The court then "weigh[ed] the Yarbough factors both, qualitatively and quantitatively," and determined "imposition of consecutive sentences on each of the offenses [wa]s appropriate." After merging the conviction for sexual assault charged in count two with the aggravated sexual assault conviction charged in count one, the court sentenced defendant to a thirteen-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the aggravated sexual assault conviction; a consecutive three-year prison term for the aggravated criminal sexual contact conviction charged in count four, and consecutive one-year prison terms for the criminal sexual contact convictions charged in counts five and six.

Consistent with the Supreme Court's mandate in Torres, 246 N.J. at 267-68, the trial court issued a statement of reasons for imposing consecutive sentence and expressly addressed the overall fairness of the aggregate sentence:

> Here, an aggregate sentence of eighteen years with a period of parole ineligibility that will total a little over seven years after jail credits are applied is a fair sentence as it takes account of the blameworthiness of . . . defendant's multiple crimes against this victim, the defendant's current age, the real-time impact of [NERA], and the fact that . . . defendant had never before committed an offense. All of the sentences are at or close to the bottom of the authorized range.

29

Not surprisingly, defendant does not challenge the court's findings on subparts (a) and (d) of the third <u>Yarbough</u> factor. Instead, he claims the court's reasoning for the remaining subparts is flawed. For example, as to subpart (a), defendant argues the offenses presented to the jury were distinguished by "types of touching" not "separate instances." Regarding subpart (c), defendant claims the court erroneously found the "separate instances" occurred during "a prolonged three-hour" period, when the State's proofs established the incident occurred "within approximately thirty minutes." In its responding brief, the State acknowledges the encounter "lasted about [thirty-two] minutes." Defendant further asserts "each conviction was for acts that occurred simultaneously" even though "there was starting and stopping during this thirty-minute encounter."

The court's finding on subpart (a), all the convictions were sexual offenses with common objectives, is potentially inconsistent with its findings on subpart (b), the offenses "constituted separate attacks," and subpart (c), the offenses were committed during "a prolonged three-hour" period. We recognize a sentencing court may make inconsistent findings, <u>see</u> <u>Fuentes</u>, 217 N.J. at 63, but the court must explain its reasons for doing so. Here, however, it appears the court's explanation is based, at least in part, on its mistaken understanding

of the duration of the encounter.  Thus, we cannot conclude on this record the court did not mistakenly exercise its discretion in imposing consecutive sentences.

We therefore vacate defendant's sentences and remand for resentencing. On remand, the parties shall provide their appellate submissions to the court, including the trial transcripts.  We leave to the court's sound discretion whether to permit further briefing and argument.  We take no position on the ultimate sentence imposed on remand.  However, on resentencing, the court "should view defendant as he stands before the court on that day."  State v. Randolph, 210 N.J. 330, 354 (2012).

Affirmed in part, vacated and remanded in part.  Jurisdiction is not retained.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

31